982 A.2d 969 (2009)
410 N.J. Super. 410
STATE of New Jersey, Plaintiff-Respondent,
v.
Uche ADIM, Defendant-Appellant.
No. A-4962-05T4
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2009.
Decided November 12, 2009.
*973 Nancy C. Ferro, Ridgewood, argued the cause for appellant (Ferro and Ferro, attorneys; Ms. Ferro, on the brief).
Thomas M. Cannavo, Senior Assistant Prosecutor, argued the cause for respondent (Marlene Lynch Ford, Ocean County Prosecutor, attorney; Samuel Marzarella, Supervising Assistant County Prosecutor, of counsel; Patricia S. Toreki, Assistant County Prosecutor, on the brief).
Before Judges WEFING,[1] GRALL and LeWINN.
The opinion of the court was delivered by
GRALL, J.A.D.
Tried to a jury in absentia, defendant Uche Adim was convicted of four third-degree crimes: possession of cocaine, N.J.S.A. 2C:35-10a(1); possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5a(1), b(3); distribution of cocaine, N.J.S.A. 2C:35-5a(1), b(3); and conspiracy to distribute cocaine, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5. The judge merged defendant's convictions for possession, possession with intent and conspiracy with his conviction for distribution and sentenced defendant, who was subject to a mandatory extended term, N.J.S.A. 2C:43-6(f), to a ten-year term of imprisonment subject to a five-year period of parole ineligibility. The judge also imposed the mandatory fines, penalties, assessments and fees.
On the evening of January 18, 2000, Detective David Ash of the Stafford Township Police Department was off duty. He went to a store in a shopping plaza and, while walking back to his car, heard loud music playing in a Chevy Cavalier. The Cavalier was parked in front of and facing in the same direction as his car. Although the detective noticed the Cavalier, he did not approach its driver  Michael Henrick.
Before the detective moved his car, a Buick was driven into a parking space next to the Cavalier. Defendant was the only passenger. Detective Ash watched while Henrick left his Cavalier and defendant opened the door of the Buick. Henrick knelt behind the open door of the Buick, handed defendant cash and accepted something defendant held in his hand.
Although he was not on duty, Detective Ash had his badge and a police radio in his car. He called for back-up, left his car, went to the Buick, identified himself as a police officer and directed the driver and defendant to get out. The detective searched defendant and retrieved two cell phones, a pager and about $1300 in cash from the pockets in defendant's sweatshirt and pants. Detective Ash knew that Henrick was standing between and toward the rear of the cars, but he did not approach him until the other officers arrived. He later found a torn-off, knotted top of a plastic baggie on the ground between the cars, checked the rear wheel well of the Buick and removed from the top of the tire a knotted baggie containing four folds of a white powdery substance.
*974 Henrick and defendant were taken to police headquarters, and defendant's cell phones and pager were placed on a table while his arrest was processed. Lieutenant Conroy was in the room. Noting that the pager was signaling "non-stop," Conroy used one of the phones the detective had retrieved and responded to a page. Deborah Demyan answered the call and asked for "Pete." Posing as a friend of Pete's, Conroy spoke to Demyan; she asked when Pete would make the delivery she was expecting. Conroy arranged to come to her home as she requested. When he arrived at her door, Demyan gave him money for the cocaine and food and drink for Pete.
The service providers for the cell phones taken from defendant subsequently told Detective Ash that the phones had not been reported stolen. One was listed in the name "Pete Adim."
Henrick confessed and described what happened. Before going to the shopping plaza on January 18, he paged a man from whom he had purchased cocaine in the past and whom he knew only as "Pete." As he had in the past, Pete called Henrick in response to the page; after speaking twice, they arranged to meet in the parking lot of the shopping plaza. Henrick had his car radio on while he awaited Pete's arrival, and when Pete arrived, Henrick gave him $120 and received four folds of cocaine, which he later placed on the tire of the Buick. Prior to defendant's trial, Henrick pled guilty and was sentenced to a term of probation.
Demyan was admitted to the pre-trial intervention program. Like Henrick, Demyan knew defendant as "Pete" and had purchased cocaine from him in the past by contacting him through his pager. She acknowledged that she spoke with Lieutenant Conroy and gave him money for her drugs and food for Pete.
Henrick, Demyan, Detective Ash and Lieutenant Conroy testified at trial. Henrick and Demyan were shown a photograph of defendant; both identified him as the man they knew as Pete. The parties stipulated "that the items submitted to the lab" were "in fact cocaine" and to "the accuracy [of] the lab report and certificate of analysis."
On that evidence, the jury returned a verdict of guilty on charges of possession of the cocaine Henrick placed on the tire, possession with intent to distribute, distribution and conspiring with Demyan to distribute cocaine.
Defendant raises three issues on appeal:
I. DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO CONFRONT AND CROSS-EXAMINE A FACT WITNESS.
II. THE COURT ERRED BY NOT DECLARING A MISTRIAL AFTER THE JURY NOTIFIED THE COURT TWICE THAT IT WAS DEADLOCKED.
III. THE STATE FAILED TO DEMONSTRATE THAT DEFENDANT ADIM WAS THE OWNER OF THE CELL PHONES AND PAGER.

I
Defendant contends that he is entitled to a new trial because, after the jurors reported that they were "not in agreement" and were each "firm" on that decision, the judge gave them an instruction to deliberate further that impermissibly pressured them to reach a verdict. Because the supplemental instruction was coercive and accompanied by the judge's outline of the State's evidence, we agree that a new trial is warranted.
*975 This is the context in which the judge issued the supplemental instruction directing further deliberations. The prosecutor opened to the jury at 1:30 p.m. on August 8 and the jurors commenced deliberations at 12:05 p.m. on August 9. The jurors broke for a one-hour lunch at 12:30 p.m. At 2:35 p.m. the jurors sent the judge a note that read: "The record will reflect we cannot agree on any of the counts. What should we do from here?"
The judge responded:
Well, the short answer is, is that you've really only been deliberating for a short period of time, and you should continue to deliberate.
I can't tell you how to deliberate or discuss the evidence to see if you can reach an agreement on the facts, but I will remind you that you are the judges of the facts, and you are to apply the law as I have instructed you to the facts as you find them to be.
I can tell you that we have the balance of the afternoon, and we'll deliberate through the afternoon. We have all day tomorrow, and we'll continue to deliberate with a view towards reaching a verdict in that regard.

[(Emphasis added).]
The judge also repeated an instruction on reasonable doubt.
At 3:40 p.m. the jury asked for a reading of Henrick's testimony. The judge granted that request.
The jurors resumed their deliberations at 4:00 p.m. At 4:40 p.m. the judge summoned the jurors to the courtroom and asked whether it would "be fruitful" for them to stay until 5:00 p.m. He assured the jurors that he would not keep them past 5:00 p.m. because they would have "all day tomorrow" and told them that he would not be available on Friday or Saturday.
The jury retired and responded with a note. They advised, "We do not feel the extra time (till 5 p.m.) will be helpful." Before discharging the jurors for the night, the judge told them that they had "put in a full day" and could resume deliberations at 8:45 a.m. the next day. He further explained: "It's not a complicated case. And we will have all day tomorrow, so there is no rush."
At 9:55 a.m. the following day, the jurors reported that they were unable to reach an agreement. That note read: "We are not in agreement on any of the counts. Each of the jurors are firm in their decision. We do not feel further discussions will be helpful."
The judge charged the jury to resume deliberations.
Well, you have been here for an hour. You spent four hours yesterday, basically about four hours, a little less than four hours, deliberating yesterday. It certainly would be easy for me to say, okay, I'm going to accept this letter and I'm going to discharge the jury, and we'll have what we call a hung jury.

But I'm not prepared to do that yet. And I'm going to ask you each to revisit your positions. I don't know what those positions are or who's where, and I'm not asking anybody to tell me that. I certainly can't ask for a show of hands. It's not my province to do that.
But I will read a portion of the instructions to you again, and I will ask you to pay heed to this. And before I do that, I want to remind you that the evidence that you're analyzing and the job of jurors is to determine the facts from the evidence, and not to speculate on facts that are not in evidence or about which there has been no testimony.

*976 You have four witnesses in this case, and the stipulated evidence, and that's it. We have four exhibits. Two of those exhibits are stipulated into evidence.

S-3 is the package containing the item that was recovered by Detective [Ash], those four envelopes. S-4 is the crime lab request for analysis, analysis, and certificate of analysis, those two sheets of paper, a green piece of paper and a white piece of paper.

That's stipulated evidence. That means that the defense attorney and the prosecutor agree that those items are evidence. That's not in dispute. S-4 says that the substance that's in S-3 is cocaine. That's fact. That's stipulated. That is not in dispute, if I'm not mistaken. That's one of the elements that the State has the burden of proving.

You have the testimony of Detective [Ash]. And your recollection of what he testified to, as to what he saw while he was off duty and the action that he took when he was off duty, was for you to view and analyze and determine the credibility of those statements.
You have the testimony of Lieutenant Conroy, who testified about his involvement with the beeper and the cell phone and what he did with regard to that other evidence.
You have the testimony of Mr. [Henrick], who said he was there, he got arrested, and that he bought drugs from the defendant. That's what he said. Of course, you have that. And you have the testimony of Miss [Demyan], who said that she called back and forth and requested Pete to come to her house.

That's the evidence. I remind you that your personal decision of guilt or innocence should be made only after you have impartially considered all the testimony and the evidence together with your fellow jurors.
In the course of deliberating, do not hesitate to re-examine your own views and to change your position if you become convinced that your original position was erroneous. Do not surrender an honest belief as to the weight and effect of the evidence solely because your fellow jurors have a different opinion, or for the mere purpose of returning a verdict. Don't violate your conscience or be less than intellectually self-honest.

I remind you that you are not here to serve or act as partisans. You are not called here to take sides with either the State or the Defense. In fulfilling your oaths as jurors, you are to ascertain to the best of your ability the truth as you glean it to be from the evidence and the testimony presented to you during the trial, and to return a just and true verdict.

Lastly, I will remind you that if the State has convinced you beyond a reasonable doubt as to each of the elements of the offenses  and I supplied that, those elements to you  has convinced you with Count 1 those elements, Count 2 those elements, Count 3 those elements, and Count 5 those elements, each of those elements, if the State has convinced you beyond a reasonable doubt, then you must find the defendant guilty.
If the State has failed to convince you of any of the elements on each count separately, then you must give the defendant the benefit of the doubt and find him not guilty.

You must, not you may. You must, either way. The law says if you find the State has met its burden, you must find the defendant guilty. If the State has not met its burden, you must find the defendant not guilty.

*977 Now, I recognize that you probably are not having fun right now. That didn't come with the guarantee. That's not part of the package. Your responsibility as jurors is to discuss and deliberate and find the facts, determine the facts as you glean [them] to be, and to return a just and true verdict.

I thank you for this further opportunity to give you some instruction. And I will ask you to return to the jury room and to revisit your deliberations. Thank you.
[(Emphasis added).]
The jurors resumed their deliberations at 10:01 a.m.
Defense counsel objected to this supplemental instruction on the ground that the jurors would misinterpret it as one directing them "that they have to arrive at a verdict." The judge responded:
[B]ecause it's not a complicated case, I have difficulty in understanding what they're having difficulty with. And whether their verdict be guilty or not guilty  and I don't think the court has given them any indication in my further instructions as to how they should decide the case  I am encouraging them to revisit their thoughts with an effort to arriving at a verdict one way or the other.
At 12:20 p.m., the jurors returned their verdict.
"[T]he right to a free and untrammeled verdict ... is the core of the right to trial by jury." State v. Figueroa, 190 N.J. 219, 233, 919 A.2d 826 (2007) (internal quotations omitted); State v. Czachor, 82 N.J. 392, 400, 413 A.2d 593 (1980); In re Stern, 11 N.J. 584, 588, 95 A.2d 593 (1953). A legitimate verdict must "`rest upon the convinced understanding of the individual jurors.'" Czachor, supra, 82 N.J. at 400, 413 A.2d 593 (quoting Stern, supra, 11 N.J. at 588-89, 95 A.2d 593). "Critical to achieving such an impartial verdict is the independent and honest judgment of each juror that the State has proved defendant's guilt beyond a reasonable doubt." Id. at 409, 413 A.2d 593.
The "honest judgment" contemplated is one based upon the evidence and the law, not extraneous considerations such as the efficiency and expense of jury trials. Id. at 398, 413 A.2d 593. The "independent judgment" that is critical is the judgment of twelve deliberating jurors each free from external pressure to conform his or her judgment with that of his peers to reach a verdict. Id. at 409, 413 A.2d 593; see State v. Jenkins, 182 N.J. 112, 133, 861 A.2d 827 (2004) (discussing the importance of each juror's participation in deliberations and open-minded dialogue); State v. Corsaro, 107 N.J. 339, 350-51, 526 A.2d 1046 (1987) (discussing juror independence, collectivity and mutuality).
Nearly thirty years ago, our Supreme Court prohibited the use of jury instructions that convey pressure to return a verdict because such pressure is "inconsistent with jury freedom and responsibility" and "does not permit jurors to deliberate objectively, freely, and with an untrammeled mind." Czachor, supra, 82 N.J. at 402, 413 A.2d 593. In Czachor, the Court held that "the interest in avoiding the expense of mistrial is outweighed by the substantial risk that the right to a fair trial at the hands of an impartial jury [will be] jeopardized" if the jury is given an instruction the "thrust" of which is to "undo a jury deadlock." Id. at 398, 413 A.2d 593. The Court approved an instruction for use in appropriate cases. Id. at 406-07, 413 A.2d 593.
A judge has discretion to require further deliberations after a jury has announced its inability to agree, Figueroa, *978 supra, 190 N.J. at 221, 235, 919 A.2d 826, but exercise of that discretion is not appropriate "if the jury has reported a definite deadlock after a reasonable period of deliberations." Czachor, supra, 82 N.J. at 407, 413 A.2d 593 (emphasis added). In deciding whether the period of deliberations has been "reasonable," "a judge should weigh all the relevant circumstances including the length and complexity of the trial." Ibid. And, generally the judge should determine whether the jurors are of the view that continued deliberations will be helpful. Figueroa, supra, 190 N.J. at 237, 919 A.2d 826.
In this case, the jurors had announced that they were "firm on their decision" and did "not feel further discussions [would] be helpful." For that reason, the judge was required to discharge the jury unless he concluded that the period of deliberations was unreasonably short given the nature of the trial evidence and other relevant circumstances. The judge's reasons for concluding that the period of deliberations was not "reasonable," however, indicates that he viewed the simplicity of the case and brevity of the trial as favoring continued deliberations. It is not necessary to discuss this apparent misapplication of the standard established in Czachor because the content of the instruction was so improperly coercive and intrusive, that reversal would be required on that ground alone.
The charge approved in Czachor is cast in terms conveying non-coercive and non-intrusive guidance for further deliberations by a jury that has not reached agreement. Id. at 405 & n. 4, 413 A.2d 593. The Court-approved instruction has been incorporated in a model charge. Model Jury Charge (Criminal), Final Charge: Further Jury Deliberations at 24 (2004) (hereinafter MJC).
More recently the Court restated its view of the significance of Czachor. "[W]e concluded that the charge then generally utilized was inherently coercive, and we directed trial courts to use instead an alternate form of the charge that would avoid pressuring dissenting jurors into surrendering their `honest convictions' about guilt or innocence merely to reach a unanimous verdict." Figueroa, supra, 190 N.J. at 221, 919 A.2d 826.
The charge given to this defendant's jury deviated from the Court-approved instruction. The significance of the deviations must be considered with reference to the "infirmities" and "deficiencies" in pre-Czachor charges that led the Court to prohibit their use and approve an alternative. Those deficiencies and infirmities include: the potential for interference with the deliberative process through introduction of extraneous considerations, Czachor, supra, 82 N.J. at 398-405, 413 A.2d 593; see Figueroa, supra, 190 N.J. at 236, 919 A.2d 826; inaccurate descriptions of a juror's duty, Czachor, supra, 82 N.J. at 398-99, 413 A.2d 593; see Figueroa, supra, 190 N.J. at 232, 919 A.2d 826; subtly coercive suggestions such as those inherent in negative implications about the capacity and impartiality of jurors who are unable to reach agreement and the prospect of prolonged and compelled deliberations, Czachor, supra, 82 N.J. at 400, 413 A.2d 593; see Figueroa, supra, 190 N.J. at 231-32, 919 A.2d 826; and juror vulnerability "to judicial suasion to compose differences," Czachor, supra, 82 N.J. at 399, 413 A.2d 593; see Figueroa, supra, 190 N.J. at 238, 919 A.2d 826.
The core problem perceived in Czachor was delivery of a charge focused on the minority, the thrust of which is to "undo a jury deadlock" rather than "simply remind jurors of their duty to cooperate in collective deliberations." Id. at 398, 413 A.2d *979 593. The following approved instruction provides the jurors with straightforward and concise guidance on the nature of their duty and what it entails:
It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous [b]ut do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
You are not partisans. You[ ] are judges  judges of the facts....
[Czachor, supra, 82 N.J. at 405 n. 4, 413 A.2d 593 (alterations bring recommended charge into conformity with MJC).]
The supplemental charge given to defendant's jury did not include the first sentence of the approved charge, which explains the relationship between collective deliberations and individual judgment. Instead, these jurors were given two descriptions  one on the meaning of a juror's oath and one on a juror's "responsibility"  both defined the obligation with reference to return of a verdict.
In fulfilling your oaths as jurors, you are to ascertain to the best of your ability the truth as you glean it to be from the evidence and the testimony presented to you during the trial, and to return a just and true verdict.
Your responsibility as jurors is to discuss and deliberate and find the facts, determine the facts as you glean [them] to be, and to return a just and true verdict.
Thus, the permissible purpose of the Czachor charge  reminding the jurors of their obligation to deliberate  was obscured by equating the return of a verdict with proper performance of duty. We recognize that these suggestions were preceded by direction to avoid "surrender [of] an honest belief as to the weight and effect of the evidence ... for the mere purpose of returning a verdict." Nonetheless, in the final analysis this jury was left without a clear explanation of the relationship between a juror's duty to deliberate and a juror's duty to refrain from relinquishing individual judgment. If the judge had given the Court-approved instruction, the jurors would have had that essential explanation. The duty is not a duty to return a verdict; an instruction that so defines the duty is coercive and inherently confusing.
Although we are confident that the judge did not intend to coerce a verdict, there was additional and subtly coercive pressure to return a verdict in the instruction. As indicated above, jury charges "suggest[ing] that a failure to agree on a decision will reflect adversely on the sophistication, intelligence, impartiality, and competence of the jurors" are considered coercive, because they have a "natural tendency... to put pressure on dissenting jurors to join with those ostensibly sophisticated and intelligent jurors who have resolved all reasonable doubts." Id. at 405, 413 A.2d 593. While that pressure is increased by explicit focus on the jurors in the minority, id. at 398, 413 A.2d 593, even without an express reference to the minority, that focus is implicit when the instruction defines performance of a juror's duty as the return of a verdict.
In this case the negative implications about juror capacity and impartiality were conveyed by the judge's reference to the *980 simplicity of the case and the evidence. Before discharging the jurors for the evening after the first afternoon of deliberations, the judge told them the case was "not complicated."
When the jurors were unable to agree after additional deliberations on the following day, the judge provided a concise and abbreviated outline of the evidence. "You have four witnesses in this case, and the stipulated evidence, and that's it." After naming each witness and identifying the subject of his or her testimony, the judge concluded: "That's the evidence." This concise outline tended to demonstrate what the judge implied the night before  this case was not complicated and could be resolved by adequate and impartial jurors performing their duty given sufficient time. It is difficult to conclude that a juror given that simple outline would not be influenced to conclude that any doubt based upon complexities was an unreasonable doubt.
The judge's act of outlining the evidence was not only subtly coercive but also intruded upon the deliberative process. The jury's "deliberative process ... must be insulated from influences that could warp or undermine the jury's deliberations and its ultimate determination." Corsaro, supra, 107 N.J. at 346, 526 A.2d 1046; see Figueroa, supra, 190 N.J. at 236, 919 A.2d 826 (noting that the Court's general focus in addressing supplemental instructions on jury deliberations is "on limiting any kind of interference with the deliberative process"); Czachor, supra, 82 N.J. at 398-405, 413 A.2d 593 (severely criticizing supplemental instructions that interfere with the jury's deliberations by injecting more subtle extraneous concerns such as the time and expense of a mistrial).
"[T]he jury has a `nondelegable and nonremovable' responsibility to find the facts and to determine ultimate guilt or innocence," and interference with the jury's obligation must be avoided. Corsaro, supra, 107 N.J. at 346, 526 A.2d 1046 (quoting State v. Ingenito, 87 N.J. 204, 210-12, 432 A.2d 912 (1981)). A judge has no role in a jury's fact finding and may not participate in deliberations. Disagreement or confusion about the existence and significance of evidence must be resolved by the deliberating jurors on the basis of their recollection and evaluation of persuasive force and the reasonableness of any doubt arising from the absence of evidence.
"Preservation of the jury's independence from extraneous-even judicial-influences is a value repeatedly confirmed by [the Supreme] Court." Corsaro, supra, 107 N.J. at 350, 526 A.2d 1046. We fail to see how a judge's summary of the evidence is not inherently and inevitably likely to burden deliberations with an extraneous consideration, i.e., speculation about the judge's view of the evidence.
Even when the trial is short and the witnesses are few, the likelihood of inadvertent impact on deliberations is too high to be overstated. The judge does not know what evidence is or is not a source of disagreement. For that reason, a judge should not underestimate the importance jurors will give guidance coming from the court or overestimate his or her individual capacity to provide a wholly neutral and accurate outline incapable of influencing deliberations. It is reasonable to assume that jurors in disagreement about a fact not mentioned by the judge will alter their view of that fact's importance in the belief that the judge has identified what is important and left out what is insignificant. The judge's view of the evidence, however, like that of a juror who is not one of the twelve selected to deliberate, should not be a factor considered by the deliberating *981 jurors. The decision is committed to the good judgment of the jurors, and the views of non-jurors are as "extraneous" to the jury's deliberations as worries about the cost of a new trial.
The inherent risks of such influence are easily illustrated with reference to the evidence and summary outline put before the jury in this case. The judge's description of the stipulations and their import was capable of misdirecting deliberations. It can be understood to state there was a stipulation that the drugs comprising S-3 were "recovered by Detective Ash," but that was not stipulated. Moreover, jurors are not required to accept a stipulation, State v. Wesner, 372 N.J.Super. 489, 494, 859 A.2d 734 (App. Div.2004), certif. denied, 183 N.J. 214, 871 A.2d 92 (2005), which was not explained.[2] Henrick and Demyan testified as the judge indicated, but Henrick also testified about his plea agreement, and Demyan also testified about her admission to PTI.
No one can know whether a juror questioning Henrick's or Demyan's credibility was influenced by what the judge selected to include and exclude in his skeletal outline of their testimony. It is clear that a conviction returned after a formerly deadlocked jury has heard a supplemental instruction capable of influencing an "undecided jury to convict" should not be sustained. State v. Jones, 214 N.J.Super. 68, 74, 518 A.2d 496 (App.Div. 1986), certif. denied, 107 N.J. 102, 526 A.2d 176 (1987).
Considered as a whole, this supplemental charge, like those disapproved in Czachor, did "not simply remind jurors of their duty to cooperate in collective deliberations." 82 N.J. at 398, 413 A.2d 593. In Czachor, the Court concluded that it would no longer rely on the assumption that a jury charge tending to coerce agreement could be "overcome or `balanced' by language to the effect that no juror `should surrender his conscientious scruples or personal convictions.'" Id. at 401, 413 A.2d 593 (quoting Stern, supra, 11 N.J. at 589, 95 A.2d 593); see id. at 405. The Court held that the "error involved in the repeated use of the [coercive] charge [at issue in that case could not] be salvaged or erased by recourse to the harmless error doctrine." Id. at 404, 413 A.2d 593.
In this case, the combined impact of the coercive and intrusive components of this supplemental instruction leaves us with a reasonable doubt that the jury would have reached this verdict if given the Court-approved supplemental charge, and there is no doubt that the jury would not have returned a verdict if it was discharged after announcing its "firm" deadlock. Accordingly, we reverse and remand for a new trial. See State v. Castagna, 187 N.J. 293, 312, 901 A.2d 363 (2006) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-11 (1967)).

II
Because the issue may arise on retrial, we address defendant's claim that the denial of his request to compel the State to identify a witness to the crime deprived him of his right to confrontation.
The issue arose prior to trial. The witness the State declined to identify is a friend of Detective Ash who was in his car while he dealt with defendant and the driver of the Buick. She saw Henrick place something near the Buick's rear tire and told Detective Ash. That information led him to look under the rear tire well and find the drugs.
*982 Defense counsel learned about this witness because the detective's report, which was provided in discovery as required by Rule 3:13-3(c)(8), mentioned her, the information she gave the detective, and her unwillingness to have her identity disclosed. The prosecutor, however, did not provide her name and address. R. 3:13-3(c)(6). Instead, the State invoked the privilege to refuse to disclose the identity of a person who has provided information about the crime, N.J.R.E. 516 (adopting N.J.S.A. 2A:84A-28). See R. 3:13-3(f)(1).[3]
On the eve of trial, defense counsel moved to compel the State to identify the witness, and the trial judge properly determined that defendant was entitled to a hearing on that request. A hearing out of the presence of the jury is one means by which the court can acquire information needed to evaluate the State's exercise of the informer's privilege. State v. Postorino, 253 N.J.Super. 98, 108, 601 A.2d 223 (App.Div.1991); see also R. 3:13-3(f)(2) (authorizing in camera inspections of written statements).
Detective Ash, the only witness at the pre-trial hearing, explained that his friend owns a store in the shopping plaza in which he made the arrest. He went to the plaza to take her to dinner and she was in his car when she saw Henrick put something near the Buick's rear tire. She got the detective's attention, pointed to the rear of the Buick and let him know that she saw Henrick make "movements and place[ ] something under the rear passenger side of the" Buick. Armed with that information, he checked the rear tire well right away. According to the detective, he would have done that eventually even if his friend had said nothing because he knew where Henrick was standing while he was occupied with defendant. Detective Ash also explained that he and his friend were concerned that revelation of her identity would pose a threat to her and to her business.
Although defense counsel cross-examined Detective Ash at the hearing, he did not elicit any testimony indicating that the detective's friend saw anything other than Henrick's movement.
The judge denied defense counsel's request to compel the State to identify the witness. He found that the witness was a citizen who had a personal relationship with a police officer and legitimate reason for concern about retaliation based on her business, her relationship with the detective and defendant's release on bail and failure to appear for trial.
In considering defendant's request, the judge also assessed the significance of this informer's testimony and its possible value to the defense. In the judge's view, the informer's observation was not significant because it simply shortened an investigation that would have inevitably led to the discovery even if she were not present. The judge further noted that Henrick, who had pled guilty, was scheduled to testify on behalf of the State. Although defense counsel contended that the informer might have made other observations relevant to impeach the detective, he had no facts to support that speculation.
We begin our analysis by noting that defendant's right to confront the detective's friend through cross-examination was not abridged. The State did not introduce testimony from Detective Ash repeating or even suggesting the information received from his friend. See State v. *983 Bankston, 63 N.J. 263, 269, 307 A.2d 65 (1973) (discussing violation of the right of confrontation based on the introduction of such hearsay). Moreover, because this informer did not testify at trial, defendant's right of confrontation was not limited by a denial of access to information that might be useful to impeach her credibility. See State v. Florez, 134 N.J. 570, 581, 636 A.2d 1040 (1994) (discussing the importance of providing the defendant with the name and address of a testifying witness and relying on Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956, 959 (1968)).
Defendant's claim that his right to confrontation was limited because he was denied an opportunity to use the unidentified witness to impeach Detective Ash is more aptly characterized as one implicating his rights to due process and compulsory process. See United States v. Valenzuela-Bernal, 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193, 1204 (1982) (discussing the constitutional rights implicated by the government's deportation of witnesses that made them unavailable to the defense with reference to decisions addressing the government's exercise of a privilege to refrain from identifying an informant); Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019, 1025 (1967) (invalidating a state's evidentiary rule precluding defendant from presenting testimony of a co-defendant as violating the right of compulsory process provided by the Sixth Amendment applicable to the states through the Fourteenth Amendment); cf. id. at 24-25, 87 S.Ct. at 1925-26, 18 L.Ed.2d at 1026 (Harlan, J. concurring) (concluding that the Texas rule violated the Fourteenth Amendment).[4]
That claim lacks sufficient merit to warrant discussion beyond the brief comments that follow. R. 2:11-3(e)(2).
The State has a "privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of" the law. N.J.R.E. 516; N.J.S.A. 2A:84A-28. "`The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.'" State v. Milligan, 71 N.J. 373, 381, 365 A.2d 914 (1976) (quoting Roviaro, supra, 353 U.S. at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644). The rationale is straightforward  citizens have an obligation "to communicate their knowledge of the commission of crimes to law-enforcement officials" and "by preserving their anonymity" the privilege encourages compliance and the flow of information to the government. Ibid.
Defendant contends that the privilege cannot be invoked unless the informer has an ongoing relationship with law enforcement. But, consistent with its purpose, this privilege is defined to apply to "a person" who gives information not only to those informers who do so on a regular basis or pursuant to a mutually beneficial arrangement with the police. N.J.R.E. 516. Defendant's argument overlooks the chilling effect that would follow if the State were required to identify every ordinary *984 citizen who provides information based on observation of, rather than participation in, a crime or the concealment of the evidence of a crime.
True, the so-called "informer's" privilege does not apply when its purpose will not be served. For that reason, N.J.R.E. 516(a) prohibits invocation of the privilege when the informer's identity has already been disclosed and concealment would be a futile gesture. But the goal of encouraging communication with law enforcement officers is not similarly defeated because future cooperation by the individual informer in question is not expected. Considering the logic and common sense of the circumstance of ordinary citizens who must decide whether to remain silent or report a crime or suspicious conduct, there is nothing to commend a bright-line rule precluding exercise of the privilege based upon the absence of an ongoing reporting relationship between the individual citizen and the authorities.
The important limitations on exercise of this privilege are those "essential to assure a fair determination of the issues" at trial. N.J.R.E. 516(b); see State v. Infante, 116 N.J.Super. 252, 257, 282 A.2d 44 (1971) (noting "[t]he identity of the informer must be disclosed when it is necessary and relevant to a fair defense"); Milligan, supra, 71 N.J. at 384, 365 A.2d 914 (quoting Roviaro, supra, 353 U.S. at 62, 77 S.Ct. at 628, 1 L.Ed.2d at 646). The State's interest in protecting the informant is balanced against the defendant's need for the information. When the defendant demonstrates that the identity of the informer or the informer's testimony "is material to the defense and to a balanced presentation of essential issues," the "imperative for trial fairness" outweighs the government's interest in protecting a witness even if the informer's safety "would be imperiled" by disclosure. Florez, supra, 134 N.J. at 582, 636 A.2d 1040.
To determine "whether the State must disclose the true identity of an informant, courts weigh and balance the competing considerations on a case-by-case basis." Florez, supra, 134 N.J. at 579, 636 A.2d 1040. The court must consider "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Ibid. (quoting Roviaro, supra, 353 U.S. at 62, 77 S.Ct. at 628-29, 1 L.Ed.2d at 646). The defendant must demonstrate the materiality of the informer's identity or testimony. Milligan, supra, 71 N.J. at 390, 365 A.2d 914.
The factors relevant to "materiality" include the informer's connection with the crime and the role the informer will play at trial. For example, when the State uses an informer to participate in a "reverse-sting" and presents the informer's testimony at trial, measures taken to shield the informer's identity out of concern for safety impermissibly infringe upon a defendant's right to cross-examine the informer-witness. Florez, supra, 134 N.J. at 580-81, 636 A.2d 1040; see Postorino, supra, 253 N.J.Super. at 100, 105-09, 601 A.2d 223 (discussing measures the trial court should take prior to disclosing the identity of an informer who would be "a principal State witness"). In contrast, when an informer does not testify and was not involved in the crime, information that would be relevant to impeach the informer's credibility has no bearing on the issues at trial. Moreover, and most pertinent in this case, a defense request based on "the possibility that the informer's testimony might controvert" an officer's story is deemed "too speculative and remote" to require the State to choose between identifying an informer and foregoing a prosecution. *985 Milligan, supra, 71 N.J. at 392, 365 A.2d 914.
"The appropriate standard for reviewing the denial of a motion for disclosure [of the identity of a person who has given information to the police] is to determine whether the trial court abused its discretion after weighing the competing considerations of the balancing test." Id. at 384-85, 365 A.2d 914. There is no basis for finding an abuse of that discretion in this case.
The State complied with its obligation to disclose the existence of the witness and the information she gave the detective, and defendant was granted an evidentiary hearing to challenge the State's reliance on the privilege. R. 3:13-3(c), (f). At the conclusion of that hearing there was nothing indicating that the detective's friend was "a material witness on a basic issue of the trial." Infante, supra, 116 N.J.Super. at 257, 282 A.2d 44. Because the detective neither saw what Henrick did nor testified about what his friend told him, her testimony about what she saw Henrick do could not be used to impeach the detective. Finally, the judge found, based upon adequate evidence in the record and his assessment of the detective's credibility, that the detective's discovery of drugs on the tire was inevitable; thus, the informer's testimony was not critical to the legality of the search.
The judge's discretionary determination to permit exercise of the privilege was based upon proper consideration of the legal principle and not wide of the mark. Accordingly, there is no reason to disturb it. Benevenga v. Digregorio, 325 N.J.Super. 27, 32, 737 A.2d 696 (App.Div.1999), certif. denied, 163 N.J. 79, 747 A.2d 287 (2000).

III
Defendant's claim that the State failed to demonstrate that he was "the owner of the cell phones and pager" is wholly lacking in merit. Simply put, defendant was not convicted of or charged with a crime that required proof of his ownership of those communication devices, and the reasonable inferences available from the testimony of Henrick and Demyan were adequate to establish that defendant is the person known to them as "Pete." R. 2:11-3(e)(2).
Reversed and remanded for a new trial.
NOTES
[1] Judge Wefing did not participate in oral argument. However, the parties consented to her participation in the decision. R. 2:13-2(b).
[2] The initial charge also omitted that instruction on the law.
[3] Although we do not have the report, defense counsel utilized and repeatedly referred to its contents during the pre-trial hearing.
[4] The Supreme Court's leading decision on exercise of the informer's privilege, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), was not decided as a matter of constitutional law, but the Supreme Court has since recognized that the limitations on invocation of the privilege imposed by Roviaro satisfy the constitutional restrictions. Valenzuela-Bernal, supra, 458 U.S. at 870, 102 S.Ct. at 3448, 73 L.Ed.2d at 1204 (discussing McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967)); see Gaines v. Hess, 662 F.2d 1364, 1368 (10th Cir.1981) (agreeing "with the other federal courts that have actually ruled in the context of habeas corpus proceedings, that disclosure of an informant's identity in situations analogous to Roviaro is mandated by the Constitution" and citing cases).