**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3944-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MELVIN Y. CORREA, a/k/a
MELVIN CORREA CORREA
and MELVIN CORREACORREA,

     Defendant-Appellant.

_____

Submitted January 13, 2021 – Decided March 22, 2021

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 18-01-0003.

Joseph E. Krakora, Public Defender, attorney for appellant (Candace Caruthers, Assistant Deputy Public Defender, of counsel and on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Melvin Y. Correa of third-degree possession of a controlled dangerous substance (CDS), cocaine, N.J.S.A. 2C:35-10(a)(1), and fourth-degree possession of drug paraphernalia with intent to distribute, N.J.S.A. 2C:36-3. Defendant argues we should reverse his convictions because: the court erred by denying his motion to suppress physical evidence seized during a search of his home that was authorized by a search warrant; the State's drug expert improperly opined at trial about defendant's intent; and the court improperly denied defendant's motion for a mistrial and gave the jury a "further deliberations" instruction. We are unpersuaded by defendant's arguments and affirm.

I.

In September 2017, Union County Prosecutor's Office Detective Nicholas Veltre submitted an affidavit in support of an application for a search warrant for defendant's apartment in a building in Elizabeth. In his affidavit, Veltre explained he has been employed as a detective since 2013 and he conducts narcotics investigations daily.

Veltre also stated he received information from a confidential informant (CI) about a man involved in distributing cocaine in Elizabeth. The CI advised

Veltre the individual received orders for cocaine over the telephone and arranged to meet his customers at locations he designated to complete the transactions. The CI said the individual stored the cocaine in his residence and vehicles and conducted drug sales using a black Mitsubishi SUV and a black Mitsubishi sedan. The CI provided Veltre with the license plate numbers of the two vehicles.

The CI provided Veltre with a physical description of the man. Based on the information provided by the CI, Veltre obtained a photograph of defendant from the Division of Motor Vehicles. When shown the photograph, the CI identified defendant as the individual he described as involved in the distribution of cocaine.

During the week of September 4, 2017, Veltre conducted surveillance and observed defendant arrive at the building later confirmed as defendant's residence. Defendant drove a black Mitsubishi SUV with the license plate number the CI provided. Veltre saw defendant park the vehicle and then walk to a black Mitsubishi sedan with the license plate number the CI had provided. The sedan was parked in the driveway of defendant's residence. Defendant entered the sedan and moved around objects in the vehicle.

A-3944-18

During the week of September 4, 2017, the CI made a controlled purchase of cocaine from defendant. As Veltre explained in the search warrant affidavit, while in Veltre's and another detective's presence, the CI called defendant at a number defendant previously provided to the CI. During the telephone call, the CI made arrangements to purchase cocaine from defendant. The CI was searched by the police and found not to be in possession of any cocaine, and then, while under constant surveillance, the CI travelled to a location designated by defendant. Law enforcement officers observed defendant arrive at the location in the Mitsubishi sedan. The officers saw the CI and defendant engage in a hand-to-hand transaction. Following the transaction, the police observed defendant drive the sedan directly to his residence, where he parked the vehicle and entered the residence through a side door.

Meanwhile, while under constant surveillance, the CI returned to meet the other officers. The CI told Veltre that following a brief conversation at the designated location, defendant provided cocaine in exchange for the currency Veltre had given the CI for the controlled purchase. The substance the CI purchased from defendant tested positive for cocaine.

During the week of September 15, 2017, the CI made a second controlled purchase of cocaine from defendant. The purchase was arranged during a phone

A-3944-18

call between the CI and defendant. The CI contacted defendant on a number defendant provided the CI, and Veltre and another detective were present during the call. Shortly after the call, defendant was observed exiting the side door of his residence, entering the Mitsubishi SUV, and driving to the location he had designated for the transaction with the CI.

The police again searched the CI to confirm the CI was not in possession of any controlled dangerous substances, and officers thereafter surveilled the CI during the CI's travel to the location defendant had designated. Police officers observed defendant arrive at the location in the Mitsubishi SUV and engage in a hand-to-hand exchange with the CI.

Following the exchange, the CI remained under constant surveillance, and the CI met with law enforcement officers. The CI explained defendant had turned over cocaine in exchange for the currency the police provided the CI. The substance defendant sold the CI tested positive for cocaine.

Veltre's search warrant affidavit described the building in which defendant lived as a three-story, multi-family structure. The building's address is listed as defendant's residence on his driver's license. Veltre's affidavit explains that during the investigation, officers conducted surveillance of the building to identify defendant's apartment. Officers knocked on a side door of

the building, and defendant answered. Defendant explained to the officers that he resided in one of two basement apartments and that his apartment could only be accessed using the side door. Defendant also said the other basement apartment could only be accessed through the rear door.

Based on Veltre's affidavit, the court issued a search warrant for defendant's basement apartment residence, defendant's person, and the two Mitsubishi vehicles. Officers executed the warrant on October 3, 2017 and seized from the residence a black AWS scale and $8,770 in cash, consisting of twenty-six $100 bills, forty-five $50 bills, one hundred and ninety $20 bills, eleven $10 bills, and two $5 bills. The officers also seized a bag containing a blender with cocaine residue, a digital scale, cocaine, mannitol, lactose bottles, a metal spoon with cocaine residue, a cardboard box containing numerous baggies, baggies containing cocaine, a roll of duct tape, an Express loan card addressed to defendant, and a Ziploc bag containing numerous plastic bags. Additionally, the police seized sixty dollars, a silver husky knife, and a black flip phone from defendant's person.

A grand jury indicted defendant for third-degree possession of CDS, cocaine, N.J.S.A. 2C:35-10(a)(1); third-degree possession of CDS, cocaine, with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3);

6

third-degree money laundering, N.J.S.A. 2C:21-25(a); and fourth-degree possession with intent to distribute drug paraphernalia, N.J.S.A. 2C:36-3.

Defendant moved to suppress the evidence seized from his residence pursuant to the search warrant. In a detailed written decision, the court denied defendant's motion, finding Veltre's affidavit established probable cause to search defendant's residence.

At trial the State called several witnesses, including Veltre, who testified about the execution of the warrant and the items seized during the search of defendant's residence, and Detective Anthony Reimer, who testified as an expert in the field of the use, packaging, and distribution of narcotics.

Reimer testified half a gram to a gram of cocaine can be sold on the street for around $50 to $75. He opined digital scales are used to weigh controlled dangerous substances, a blender can be used to mix narcotics with a cutting agent to expand the amount of product a person would have, and lactose and mannitol are common cutting agents. Reimer further testified a gram of a substance containing mannitol and lactose would typically sell for the same amount as pure cocaine. Reimer also opined that the most common form of payment in narcotics sales is cash and that "currency when located with . . . narcotics activity could be proceeds from narcotics sales."

 A-3944-18

Defendant testified on his own behalf. He acknowledged he resided in the apartment that was searched, but he denied ownership of the cocaine and denied ever seeing cocaine in the apartment. He also denied knowledge of the blender, mannitol, and lactose found in his apartment. Defendant explained the cash found in the safe was from his employment and from selling his possessions in Puerto Rico to finance his move to the United States.

During its deliberations, the jury sent the court a note, stating the jurors were unable to reach a verdict on the charges and that they did "not believe continued discussion will reach a decision." The jury asked, "How do we proceed?" Defendant moved for a mistrial, and the court denied the motion. The court instructed the jurors to continue deliberating, but also instructed that if the jurors determined "further deliberations will be futile," they should notify the court in another note.

After further deliberating, the jury found defendant a guilty of third-degree possession of CDS and fourth-degree possession of drug paraphernalia with intent to distribute. The jury could not reach a unanimous verdict on the third-degree possession of CDS with intent to distribute and third-degree money laundering charges. Those charges were later dismissed. The court later sentenced defendant to twenty days in jail and three years of probation for

8

possession of CDS, to run concurrent to defendant's sentence of eighteen-months' probation for possession of drug paraphernalia with intent to distribute.

Defendant appeals from his convictions. He presents the following arguments for our consideration:

POINT I

THE MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED BECAUSE THE SEARCH WARRANT APPLICATION FAILED TO ESTABLISH A NEXUS BETWEEN THE HAND-TO-HAND DRUG TRANSACTIONS ON THE STREET AND DEFENDANT'S RESIDENCE.

POINT II

THE STATE'S DRUG EXPERT'S TESTIMONY VIOLATED THE HOLDINGS OF STATE V. CAIN AND STATE V. SIMMS BY OPINING DIRECTLY ON DEFENDANT'S INTENT, WHICH WAS AN ULTIMATE ISSUE OF FACT SOLELY FOR THE JURY, REQUIRING REVERSAL.

POINT III

THE TRIAL COURT SHOULD HAVE DECLARED A MISTRIAL ONCE THE JURY INDICATED THAT IT WAS "UNABLE TO REACH AGREEMENT ON ANY CHARGES" AND SHOULD NOT HAVE ISSUED A "FURTHER DELIBERATIONS" INSTRUCTION.

A. The Requested Mistrial Should Have Been Granted After the Jury's Initial Deadlock Announcement.

B.  It Was Improper for the Judge to Issue a "Further Deliberations" Instruction.

II.

We first consider defendant's argument the court erred by denying his motion to suppress the evidence seized from his residence.  Defendant contends Veltre's affidavit did not establish a sufficient nexus between defendant's residence and defendant's drug sales to the CI to establish probable cause to search the residence.  We are not persuaded.

Generally, our review of a motion to suppress is limited.  State v. Robinson, 200 N.J. 1, 15 (2009).  We will "uphold a trial court's factual findings . . . [when] 'supported by sufficient credible evidence in the record.'" State v. Watts, 223 N.J. 503, 516 (2015) (quoting State v. Elders, 192 N.J. 224, 243 (2007)).  "However, we owe no deference to conclusions of law made by lower courts in suppression decisions, which we instead review de novo."  State v. Boone, 232 N.J. 417, 426 (2017).

Both our state and federal constitutions "provide in nearly identical language that 'no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.'"  State v. Marshall, 199 N.J. 602, 610 (2009) (quoting N.J. Const. art. I, ¶ 7); U.S. Const. amend. IV.  To properly issue a

10

search warrant, a "judge must be satisfied that there is probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched." State v. Sullivan, 169 N.J. 204, 210 (2001).

Although not easily defined, probable cause "is generally understood to mean . . . 'more than mere naked suspicion.'" State v. Gathers, 234 N.J. 208, 220 (2018) (quoting State v. Keyes, 184 N.J. 541, 553 (2005)). It exists when officers have "a 'well[-]grounded' suspicion that a crime has been or is being committed." Sullivan, 169 N.J. at 211 (quoting State v. Waltz, 61 N.J. 83, 87 (1972)). A probable cause finding requires that a court "make a practical, common sense determination whether, given all of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" State v. O'Neal, 190 N.J. 601, 612 (2007) (quoting State v. Moore, 181 N.J. 40, 46 (2004)); see also State v. Chippero, 201 N.J. 14, 28 (2009). When a search is made pursuant to a warrant, probable cause is determined "based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge." Marshall, 199 N.J. at 611 (quoting Schneider v. Simonini, 163 N.J. 336, 363 (2000)).

"A search . . . executed pursuant to a warrant is 'presumptively valid,' and a defendant challenging the issuance of that warrant has the burden of proof to establish a lack of probable cause . . . ." Boone, 232 N.J. at 427 (quoting Watts, 223 N.J. at 513-14). Thus, we "accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant," ibid. (alteration in original) (quoting State v. Jones, 179 N.J. 377, 388 (2004)), and will generally err on the side of sustaining the search when there is doubt as to the factual adequacy offered to establish probable cause, Jones, 179 N.J. at 388-89.

As noted, defendant contends Veltre's affidavit did not establish probable cause to search defendant's home. Defendant argues the affidavit demonstrates only that defendant sold cocaine from his two vehicles and the affidavit did not establish a sufficient nexus between the two controlled buys and defendant's home to support a finding of probable cause there was evidence of a crime in the home. Defendant also claims the affidavit demonstrated nothing more than defendant sold cocaine at the locations the two controlled buys took place, and the affidavit lacked sufficient information to establish probable cause defendant distributed cocaine from his residence.

Based on our review of the affidavit, we are convinced it amply supports the warrant judge's finding of probable cause to search defendant's residence.

12

The affidavit explained that during the CI's first telephone call to defendant, defendant agreed to sell cocaine to the CI. When he arrived at the location, defendant was in possession of cocaine, which he handed to the CI in exchange for currency. Following that transaction, defendant returned directly to his residence.

The affidavit further shows that shortly after agreeing to make the second cocaine sale to the CI, defendant was observed leaving his residence, entering one of his vehicles, driving to the location he designated, and delivering cocaine to the CI in exchange for currency.

"The totality of the circumstances must be considered in determining whether there is probable cause." O'Neal, 190 N.J. at 612. Here, those circumstances include defendant immediately going to his residence after receiving currency for the cocaine he had just sold to the CI, and, days later, leaving his residence and going directly to a designated location with the cocaine he sold to the CI. Those circumstances support a "common sense determination" that there is a "fair probability" defendant not only stored the cocaine that he sold in his home, but that he also kept the proceeds of his sales—the currency—there. See ibid. The motion court therefore properly concluded Veltre's affidavit supported a finding of probable cause to search defendant's residence.

See State v. Myers, 357 N.J. Super. 32, 39-40 (App. Div. 2003) (finding probable cause to support a warrant to search a defendant's home where officers observed defendant leaving his home and engaging in drug transactions).

We reject defendant's reliance on Boone to support his claim that the controlled "buys did not offer any basis to conclude that drugs were stored" at his residence. In Boone, the Court found a warrant application to search one unit in a multi-unit complex did not establish probable cause because "there was nothing in the affidavit to indicate where [the defendant] lived, how police knew which apartment was his, or how the apartment was connected to his drug dealing." 232 N.J. at 430. Here, officers observed defendant enter and exit the side door of the building directly before and after drug sales, and they confirmed defendant's vehicles were registered to him at the building address. In addition, defendant told two officers prior to the issuance of the warrant that he lived in the basement apartment and that his apartment was the only apartment that could be accessed through the building's side door. Thus, unlike in Boone, the search warrant affidavit established "a fair probability that contraband or evidence of a crime [would] be found" at defendant's apartment that was identified in the affidavit and for which the search warrant was expressly issued. See Moore, 181 N.J. at 46; see also Myers, 357 N.J. Super. at 39-40.

Defendant did not sustain his burden of establishing the search of his residence pursuant to a warrant was not supported by probable cause. We affirm the court's denial of defendant's suppression motion.

III.

Defendant next claims his convictions should be reversed because the State's expert, Reimer, improperly offered an opinion about defendant's intent to use various items seized from defendant's home. Defendant argues Reimer's testimony constituted indirect, and impermissible, opinion testimony defendant had an intent to distribute drugs.

We review the admissibility of expert testimony applying the abuse of discretion standard. State v. Summers, 176 N.J. 306, 312 (2003). Expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. To be admissible under N.J.R.E. 702, "the expert testimony must 'concern[] a subject matter beyond the ken of an average juror.'" State v. Covil, 240 N.J. 448, 464 (2020) (alteration in original) (quoting State v. Cain, 224 N.J. 410, 420 (2016)). So long as the expert testimony involves a "subject matter . . . beyond the ken of the average juror" and "assists 'the trier of fact,'" State v. Nesbitt, 185 N.J. 504, 514 (2006) (citations omitted), it is

15

admissible, even if the testimony "embraces an ultimate issue to be decided by the trier of fact," State v. Simms, 224 N.J. 393, 403 (2016) (quoting N.J.R.E. 704). "Expert testimony is not necessary to tell the jury the 'obvious' or to resolve issues that the jury can figure out on its own." Ibid. Instead, such "testimony should be limited to areas that are beyond the understanding of the jury." State v. Sowell, 213 N.J. 89, 102 (2013).

In criminal drug cases, experts may "help jurors understand the indicia of a distribution operation, such as how drug traffickers package and process drugs for distribution," or they may "shed light on the significance of the quantities and concentrations of drugs, the value of drugs, the use of identifiable logos on drug packaging, and the function of drug paraphernalia, e.g., scales, baggies, and cutting agents." Cain, 224 N.J. at 426; see also Simms, 224 N.J. at 408 (finding an expert may explain the purpose of stamping a logo on drug packaging found in the defendant's vehicle). However, "an expert witness may not opine on the defendant's state of mind. Whether a defendant possessed a [CDS] with the intent to distribute is an ultimate issue of fact to be decided by the jury." Cain, 224 N.J. at 429; see also Simms, 224 N.J. at 409.

To be sure, Reimer testified about the purpose of digital scales, blenders, and cutting agents in drug distribution cases. He explained scales are used to

weigh drugs, a blender can be used to mix narcotics with a cutting agent to expand the amount of product a person has, and lactose and mannitol are common cutting agents. He also testified that half a gram to a gram of cocaine sold for about $50 to $75 on the street, and that a substance containing mannitol or lactose sells for approximately the same amount as pure cocaine. Reimer further opined the most common form of payment in narcotics sales is cash and that "currency when located with . . . narcotics activity could be proceeds from narcotics sales."

Reimer's testimony about the value of cocaine sold on the street, the functions of drug paraphernalia, and the typical use of cash in drug transactions was properly admitted because it provided information beyond the ken of the average juror that was helpful in assisting the triers of fact understand the evidence. See Cain, 224 N.J. at 426. In providing that testimony, Reimer did not offer an opinion on intent generally or defendant's intent in particular. He instead directly explained only how items, such as scales, a blender, lactose, and mannitol, are used to prepare drugs for distribution.

Contrary to defendant's claim, we do not find the mere fact that Reimer offered an opinion concerning the manner in which the items recovered from defendant's home might be used for drug distribution as expressing an opinion

on defendant's intent or guilt. Questions posed to a drug distribution expert may properly "incorporate the evidence of record, such as the quantity of drugs, packaging materials, scales, and money discovered, and the expert can render an opinion on their significance in a drug-distribution operation." Id. at 429. Reimer properly offered testimony concerning the pertinence of the items seized from defendant's residence, including the currency found in defendant's safe, to drug-distribution activities. His opinions "help[ed the] jurors understand the indicia of a [drug] distribution operation," but he did not "express an opinion," directly or indirectly, "on matters that fall within the ken of the average juror or offer an opinion about . . . defendant's guilt." Id. at 426. We find no error in the admission of his testimony.

## IV.

Defendant contends the court erred by denying his motion for a mistrial following the jury's note stating it was "unable to reach agreement" and did "not believe a continued discussion [would] reach a decision," and asking how it should proceed. Defendant argues the court erred by giving an inconsistent and confusing jury instruction that combined the Model Jury Charges for "Judge's Inquiry When Jury Reports Inability to Reach Verdict" and "Judge's Instructions on Further Jury Deliberations." See Model Jury Charges (Criminal), "Judge's

18

Inquiry When Jury Reports Inability to Reach Verdict" (approved June 10, 2013) and Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013).  Defendant also asserts the court's instruction was coercive.

The decision to grant or deny a mistrial rests within the trial court's sound discretion.  State v. Harvey, 151 N.J. 117, 205 (1997).  "[A]n appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice."  State v. Patterson, 435 N.J. Super. 498, 510 (App. Div. 2014) (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

When a jury declares it is unable to reach a unanimous verdict, "the decision whether to grant a mistrial turns on whether the duration of the deliberations balanced against the length of the trial and the complexity of the proofs shows the jury has made a good-faith effort to reach a sustainable verdict."  State v. Gleaton, 446 N.J. Super. 478, 514 (App. Div. 2016) (quoting State v. Dorsainvil, 435 N.J. Super. 449, 481 (App. Div. 2014)).  If, after weighing these factors, a court "is not satisfied that all possibilities of reaching a verdict have been exhausted," it "may send a jury back for further deliberations."  State v. Harris, 457 N.J. Super. 34, 50 (App. Div. 2018) (quoting

State v. Carswell, 303 N.J. Super. 462, 478 (App. Div. 1997)). In contrast, "if the jury has reported a definite deadlock <u>after a reasonable period of deliberations</u>," then a court's instruction to the jury to continue deliberating constitutes an abuse of discretion. State v. Adim, 410 N.J. Super. 410, 423 (App. Div. 2009) (quoting State v. Czachor, 82 N.J. 392, 407 (1980)).

In its instruction to continue deliberations, a court "may not coerce or unduly influence the jury in reaching a verdict." Harris, 457 N.J. Super. at 50 (quoting Carswell, 303 N.J. Super. at 478); see State v. Figueroa, 190 N.J. 219, 227, 240-43 (2007) (reversing and remanding after finding the court's supplemental charge that it would be around all weekend and "as long as it takes [the jury] to go through this process" was coercive). We have explained that

> when instructing a jury that reports being deadlocked, a trial judge must be especially vigilant to avoid communicating a results-oriented message that could be perceived as intolerant of dissent and antagonistic to the free expression of strongly held beliefs that may not be shared by a majority of the deliberating jurors.
>
> [Gleaton, 446 N.J. Super. at 515 (quoting Dorsainvil, 435 N.J. Super. at 481).]

Measured against these principles, we discern no basis to conclude the court abused its discretion by denying defendant's motion for a mistrial. The jury deliberated less than an hour on the first day of its deliberations, and, on

the second day, the jury deliberated approximately four hours and fifteen minutes before submitting the note advising it was "unable to reach agreement" and did "not believe a continued discussion [would] reach a decision."[1] Given that the jurors were required to determine defendant's guilt or innocence on four separate charges and the jury had deliberated less than five hours, we do not find the court abused its discretion by denying defendant's motion for a mistrial and directing the jurors to continue deliberating. See State v. Childs, 204 N.J. Super. 639, 646-48 (App. Div. 1985) (holding a court did not abuse its discretion by directing a jury to continue deliberating when the jury had only deliberated

---

[1] We calculate the duration of the jury deliberations based on the information reflected in the trial transcripts. The transcripts reflect the jury deliberated for forty minutes, from 3:36 p.m. to 4:16 p.m., on the first day of its deliberations. On the second day of deliberations, the transcript reflects the jury's deliberations were interrupted at 9:21 a.m. while the court addressed a jury question. We assume the deliberations commenced at approximately 9:00 a.m., and thus conclude the jury deliberated for twenty-one minutes prior to the 9:21 a.m. interruption. The transcript further reflects the jury returned to the jury room at 9:27 p.m. and deliberated for one hour and thirty-four minutes until 11:01 a.m., when the court excused the jury for a break. At 11:48 a.m. the break ended, and the court played back testimony for the jury that it had requested. The jury continued deliberations for twenty minutes from 12:20 p.m. until it was excused for a one-hour lunch break at 12:40 p.m. The jury deliberated for an additional two hours, from 1:40 p.m. to 3:40 p.m., at which time it sent the note indicating it could not reach a verdict and believed further continued discussions would not result in a decision. Thus, we discern the jury deliberated for two hundred and fifty-five minutes, or four-hours and fifteen minutes, on the second day of deliberations.

approximately six or seven hours, the case involved multiple charges, it was the jury's first communication it was deadlocked, and the jurors did not indicate they would never reach a verdict); see also State v. Ross, 218 N.J. 130, 138, 145 (2014) (finding no abuse of discretion when a judge instructed the jurors to continue deliberating even though they had already deliberated for five days and indicated they were unable to reach a verdict on any count). Moreover, the jury's note requested that the court provide guidance as to how to proceed in light of the jury's belief that further discussion would not result in a decision. See Ross, 218 N.J. at 145 (explaining the trial court properly "instructed the jury to resume deliberations" where the jury "did not signal an intractable divide," "communicated that its effort to reach consensus on the issues had fallen short," and requested "direction in light of" the fact it was "unable to reach a unanimous verdict").

Under the circumstances presented, it was within the court's discretion to direct the jurors to continue deliberating, see id. at 138, 145; Childs, 204 N.J. Super. at 646-48, and the court's further deliberations instruction was in accord with the model jury charge, see Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013). Defendant did not object to the court's instruction at trial. We therefore review defendant's

22

argument under the plain error standard and must determine whether defendant demonstrates "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Wakefield, 190 N.J. 397, 473 (2007) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Defendant makes no such showing here.

In addition, to ensure its instruction was not coercive, the court expressly instructed the jury that it should immediately inform the court if it had determined further deliberations would be futile. The court instructed the jury as follows:

> If you truly feel that further deliberations will not be beneficial, and you feel that you have reached the point where further deliberations will be futile, I would ask you after you return to the jury deliberation room and have discussed the issue among yourselves to advise me of that position in another note.

The instruction is materially the same as the model jury charge responding to a jury's report of an inability to reach a verdict. See Model Jury Charges (Criminal), "Judge's Inquiry When Jury Reports Inability to Reach Verdict" (approved June 10, 2013). Thus, contrary to defendant's claim the court's instruction was coercive, the court clearly and expressly informed the jury it

23

should report to the court if it determined further deliberations would be futile. Consistent with the instruction, the jury later reported it was unable to reach a verdict on two of the counts charged in the indictment.

Defendant's reliance on our decision in Adim is misplaced. In Adim, the jury twice indicated it was deadlocked. 410 N.J. Super. at 420. Following the second reported deadlock, the court instructed the jury it had an "oath[]" and "responsibility" to determine the facts and "to return a just and true verdict." Id. at 426. We found the instruction—along with the trial court's act of outlining the evidence in the case to the jury—coercive, and accordingly reversed and remanded. Id. at 426-27, 430.

Unlike in Adim, the court here did not state or imply the jurors had a responsibility to return a verdict, did not outline the evidence to the jury, and did not require the jurors to continue deliberating after they indicated a second deadlock. To the contrary, the court instructed the jury to continue its deliberations in accordance with the model jury charge, and further informed the jury that it should report to the court if it determined further deliberations would be futile. The court's denial of defendant's motion for a mistrial and its instructions to the jury to continue deliberating were therefore proper. See State v. Harris, 156 N.J. 122, 184 (1998) (finding no error in the court's instruction to

the jury to continue deliberating but not to "surrender" their views or change their opinion to agree with the other jurors).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3944-18