**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0073-15T1
                   A-0633-15T1

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

ANTHONY EUGENE STEVENSON,
a/k/a ANTHONY E. DIXON,

       Defendant-Appellant.

_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

LEROY TAYLOR, a/k/a LEROY T. PRINCE
DEVINE,

       Defendant-Appellant.

_____

Submitted October 22, 2018 – Decided October 31, 2018

Before Judges Fasciale, Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 12-05-0895.

Joseph E. Krakora, Public Defender, attorney for appellant Anthony Eugene Stevenson (Michael J. Confusione, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Leroy Taylor (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the briefs).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Ian D. Brater, Assistant Prosecutor, of counsel and on the briefs).

Appellant Anthony Eugene Stevenson filed a pro se supplemental brief.

PER CURIAM

In these back-to-back appeals, which we have consolidated for purposes of this opinion, Anthony Eugene Stevenson and Leroy Taylor (collectively defendants) appeal from multiple convictions related to their illegal possession and sale of narcotics and firearms. A grand jury indicted and charged them with committing numerous offenses – more than 100 offenses in total. The State tried defendants separately. We affirm as to Stevenson. As the State concedes, however, the judge erroneously handled Taylor's request to proceed pro se. We therefore reverse for a new trial as to Taylor. We will first address Stevenson's contentions, then those raised by Taylor.

2

A-0073-15T1

# I.

On appeal, Stevenson makes the following arguments:

> POINT I
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM WIRETAPS.
>
> POINT II
> THE TRIAL COURT ERRED IN DENYING DISCLOSURE OF THE CONFIDENTIAL INFORMANTS.
>
> POINT III
> THE PROSECUTOR WENT BEYOND FAIR COMMENT DURING SUMMATION, DEPRIVING DEFENDANT OF A FAIR TRIAL BELOW.
>
> POINT IV
> THE TRIAL COURT INFRINGED DEFENDANT'S RIGHT TO TESTIFY VIA THE COURT'S ERRONEOUS SANDS/BRUNSON RULINGS AND IN FAILING TO ENSURE THAT DEFENDANT WAS AWARE THAT IT WAS HIS PERSONAL RIGHT TO CHOOSE WHETHER OR NOT TO TESTIFY IN HIS OWN DEFENSE BEFORE THE JURY BELOW.
>
> POINT V
> DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

A-0073-15T1

In a pro se supplemental brief, Stevenson raises the following additional argument:

> POINT I
> THE TRIAL COURT ERRED WHEN IT DID NOT ACQUIT DEFENDANT OF THE GUN CHARGES BASED ON DUE PROCESS ENTRAPMENT.

Stevenson argues that the court erred by denying his motion to suppress evidence gathered by police pursuant to a wiretap warrant. He asserts that Detective Christopher Camilleri submitted an affidavit containing "false statements." He contends the State failed to show probable cause, and that the request for a wiretap warrant was unnecessary.

An appellate court reviewing an order denying a motion to suppress must uphold the factual findings underlying the trial judge's decision so long as they are supported by sufficient credible evidence in the record. State v. Elders, 192 N.J. 224, 243 (2007). A trial judge's findings of fact should not be disturbed unless they are "so clearly mistaken" that the interests of justice demand their correction. Id. at 244. We review a trial judge's interpretation of the law de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

N.J.S.A. 2A:156A-10 governs the grounds necessary for the issuance of a wiretap warrant. Based on the facts submitted by the applicant, that judge must conclude that probable cause exists or existed to believe that:

a. The person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in section 8 of P.L.1968, c.409 (C. 2A:156A-8);

b. Particular communications concerning such offense may be obtained through such interception;

c. Normal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ;

d. Except in the case of an application meeting the requirements of subsection g. of section 9 of P.L.1968, c.409 (C. 2A:156A-9), the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual;

e. The investigative or law enforcement officers or agency to be authorized to intercept the wire, electronic or oral communication are qualified by training and experience to execute the interception sought; and

f. In the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order, regardless of whether such evidence was derived from prior interceptions or from other sources.

A-0073-15T1

[Ibid.]

If there is no corroborative evidence offered, "the judge shall inquire in camera as to the identity of any informants or any other additional information . . . which the judge finds relevant . . . to determine if there is probable cause . . . ." Ibid.

An application for a wiretap warrant must contain a "particular statement of the facts relied upon by the applicant" including information about the person whose communications will be intercepted; the particular offenses being committed; the type of communications to be intercepted; the nature and location of the targeted facilities; the period of time for which the warrant is sought; and "[a] particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." N.J.S.A. 2A:156A-9. The New Jersey statutes on wiretap warrants mirror the federal statute, 18 U.S.C.S. § 2518(1), (3). As a result, we give "careful consideration" to federal decisions on this subject. State v. Ates, 217 N.J. 253, 269 (2014).

In his wiretap affidavit, Camilleri gave a detailed description of the investigation as of May 25, 2011. He provided information given by confidential informants (CIs) about Stevenson's distribution of "large quantities

of heroin in the Long Branch/Red Bank area"; Detective Michael Deaney's undercover purchases of several bricks of heroin from Stevenson from March through May 2011 and Deaney's phone calls arranging those purchases; calls between Deaney and Stevenson about the purchase of a handgun and the recording of the meeting at which Deaney bought a gun from Amos Castro in Stevenson's presence; and a conversation between Deaney and Stevenson about the possibility of buying another gun from "a friend" of Stevenson.

Camilleri asserted that based on the foregoing, he had probable cause to believe that Stevenson and "other as yet unidentified individuals" were utilizing the specified phone numbers to further a "large scale" and "ongoing organized criminal enterprise" involving "narcotics distribution and illicit handgun sales." He noted that the investigation had already revealed information about Stevenson's activities, but stated that "the identity of most of his co-conspirators remain[ed] unknown" and would be difficult to discover due to conspirators' use of prepaid wireless phones and false subscriber information. Camilleri believed that the criminal activity at issue was "far more extensive than what [the] investigation [had] yet identified" and that a wiretap would lead to the discovery of further evidence that Stevenson and his associates were engaged in "schemes"

A-0073-15T1

to distribute and dispense controlled dangerous substances (CDS), and to transport illegal handguns into New Jersey to sell them.

Camilleri next explained the need for wiretapping, discussing why other investigatory methods had not been entirely successful or would not likely succeed in uncovering the full extent of the conspiracy. He stated that the investigation had yet to identify Stevenson's heroin suppliers or locations where he and his associates stored heroin. The CIs were unable to provide identities of, or any other information about, Stevenson's possible co-conspirators, and had expressed unwillingness to testify against Stevenson. Deaney's undercover activities were limited to purchases of heroin from Stevenson and a gun from one co-conspirator. Camilleri opined that physical surveillance would be unhelpful since Stevenson likely acted in private locations, and that the execution of search warrants was impossible because police did not yet know what locations to search. Additionally, Camilleri stated that such searches, and/or grand jury subpoenas, would compromise the covert nature of the investigation and could cause conspirators to temporarily suspend their activities to avoid detection. Finally, analysis of call detail records and other technical phone data would only reveal what phone numbers were used to call Stevenson's identified numbers, but not the contents of the communications.

Stevenson argues that Camilleri's statements in the warrant affidavit – that Stevenson was involved in transporting illegal firearms into New Jersey – were false because they were based solely on the fact that Castro sold a gun to Deaney after Stevenson introduced the two. He also contends that Camilleri's statements that Stevenson was part of a "criminal enterprise" were false. Stevenson asserts that he made a sufficient showing that the warrant request contained such false statements, and that therefore the court erred by not holding an evidentiary hearing under Franks v. Delaware, 438 U.S. 154 (1978), and by denying his motion to suppress.

New Jersey has adopted the Franks standard for evaluating challenges to the veracity of a warrant application. State v. Howery, 80 N.J. 563, 567-68 (1979). Under Franks, 438 U.S. at 171, a court must hold an evidentiary hearing to address a challenge only if there are "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations [are] . . . accompanied by an offer of proof." "Allegations of negligence or innocent mistake are insufficient" to require a hearing. Ibid. A "defendant must make a substantial preliminary showing that the affiant, either deliberately or with reckless disregard of the truth, failed to apprise the issuing judge of material information which, had it been included in the affidavit, would have militated against

issuance of the search warrant." State v. Dispoto, 383 N.J. Super. 205, 216 (App. Div. 2006) (citation omitted). Further, even if that standard is met, if there remains sufficient content in the application to support a finding of probable cause when the allegedly false material is set aside, a hearing is not required. Franks, 438 U.S. at 171-72.

If a hearing is held and 1) the allegation of falsity or reckless disregard is established by a preponderance of the evidence and 2) without the false material the affidavit is insufficient to establish probable cause, then the warrant resulting from that application must be annulled and all evidence collected pursuant to the warrant must be suppressed. United States v. Gotti, 771 F. Supp. 535, 538 (E.D.N.Y. 1991).

To determine whether a deliberate falsehood or reckless disregard for the truth was perpetrated by the warrant applicant, the test is whether the affiant deliberately lied, "entertained serious doubts" as to the truth of his or her statements in the application, or "had obvious reasons to doubt the accuracy" of the information reported therein. United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995). "Franks does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'" United States v. Campino, 890 F.2d 588, 592 (2d Cir.

1989) (quoting Franks, 438 U.S. at 165). Moreover, a challenger's attack on a statement in an application "must be more than conclusory and must be supported by more than a mere desire to cross-examine." United States v. Jimenez, 824 F. Supp. 351, 361 (S.D.N.Y. 1993).

Importantly, the Franks analysis applies only to allegations of deliberate falsification or reckless disregard for the truth of facts, and not to the affiant's conclusions based on those facts. United States v. Armocida, 515 F.2d 29, 41 (3d Cir. 1975) (explaining that there is no need for a Franks hearing where defendant challenged only affiant's conclusion, based on available information, that he was most likely in contact with a heroin supplier). A defendant's disagreement with the affiant's interpretation of "facts fairly stated" does not satisfy the Franks standard. Jimenez, 824 F. Supp. at 361 (indicating that no hearing is necessary based upon "[a] defendant's submission of his own counter-interpretation" of facts leading to affiant's conclusion that drugs and money were moved into and out of a location); Gotti, 771 F. Supp. at 539 (stating that no hearing is necessary where defendants' only challenge was a disagreement with affiant "on the interpretation of what was overheard on" certain tapes).

Here, the judge found that Stevenson did not satisfy the requirements for a Franks hearing, because he did not demonstrate that Camilleri's application

11

contained knowingly or recklessly made false statements. As to the statements concerning Stevenson's participation in firearms trafficking, the judge found that Camilleri demonstrated Stevenson's involvement by stating that he was present during Deaney's handgun purchase from Castro and later told Deaney that a "friend" of his could obtain more guns. In regard to Camilleri's use of the phrase "criminal enterprise" in the affidavit, the judge found that the term was a "conclusion[] drawn from facts fairly stated." The judge found that the warrant was based upon probable cause and that the wiretap evidence need not be suppressed.

We conclude that Stevenson did not satisfy the Franks standard. Indeed, his motion did not challenge any "facts fairly stated" in Camilleri's warrant application, but instead challenged only Camilleri's conclusions based on those facts. That Stevenson disagreed with Camilleri's use of the term "criminal enterprise" and interpretation of the facts surrounding Castro's gun sale does not require a hearing under Franks. Further, Stevenson did not offer any proof that Camilleri deliberately falsified statements in the application or had reason to doubt the veracity of those statements, beyond his own counter-interpretation of events. Finally, even without the phrase "criminal enterprise" and the statements concerning the weapons trafficking offense, there was sufficient evidence in the

application to support a finding of probable cause to believe that Stevenson was engaged in criminal activity justifying a wiretap warrant under N.J.S.A. 2A:156A-10. As a result, a Franks hearing was unnecessary, and the trial court did not err in denying the motion to suppress on probable cause grounds.

Stevenson also argues that the court erred in finding that the warrant request established that normal investigative procedures were tried and failed before a wiretap warrant was sought. Specifically, he contends that the several less invasive investigative methods used by police prior to the warrant request were successful in uncovering sufficient evidence to prosecute him for drug offenses, so therefore the wiretap was unnecessary.[1]

A challenge to a wiretap warrant's necessity is reviewed for abuse of discretion, United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007), giving substantial deference to the warrant-issuing court's determination. United States v. Gray, 410 F.3d 338, 342 (7th Cir. 2005). To obtain a wiretap warrant, the government must demonstrate that it has made a reasonable, good faith effort to use "normal" investigative procedures before resorting to the "intrusive" method of intercepting communications. Ates, 217 N.J. at 267; United States v.

---

[1] Stevenson's brief states that police failed to "minimize[] intercepted communications." But his arguments only concern the necessity requirement.

Cartagena, 593 F.3d 104, 109 (1st Cir. 2010). However, investigating officers need not use a wiretap warrant as a "last resort," and the mere fact that another technique was available or possible does not render a wiretap unnecessary. United States v. Macklin, 902 F.2d 1320, 1327 (8th Cir. 1990). The government is not "forced to run outlandish risks or to exhaust every conceivable alternative before requesting authorization for electronic surveillance." United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989).

Instead, the warrant application must only show why other measures are inadequate for the particular investigation, United States v. Perez, 661 F.3d 568, 581 (11th Cir. 2011), including why their success "appears unlikely or too dangerous." United States v. Campos, 541 F.3d 735, 746 (7th Cir. 2008). "The government's burden of proving necessity 'is not great' and its compliance with the necessity requirement is 'reviewed in a practical and common-sense fashion.'" Ibid. (quoting United States v. McLee, 436 F.3d 751, 763 (7th Cir. 2006)). Nevertheless, mere boilerplate language regarding the difficulty of gathering evidence is insufficient; the government must base its need on facts specific to the case at hand. Id. at 749.

Even where traditional investigative methods have achieved "partial success," this "does not necessarily render electronic surveillance unnecessary."

14

Perez, 661 F.3d at 581.  For example, the government may demonstrate the necessity of a wiretap by showing that its "ability to continue obtaining actionable intelligence from such methods [is] limited," Cartagena, 593 F.3d at 110, or that the "most valuable evidence" is likely to be direct evidence of illicit transactions taking place via phone.  United States v. McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002).  Other justifications include: 1) the possibility that traditional surveillance would cause perpetrators to flee the jurisdiction, suspend criminal activities, or give false information; 2) an inability to identify locations where a perpetrator or organization stores contraband, rendering search warrants ineffective; 3) the impossibility of infiltration by CIs or agents due to the close and secretive nature of a group; 4) CIs' refusal to continue cooperating or inability to do so; 5) the use of counter-surveillance methods by perpetrators; 6) the undesirability of granting immunity to most culpable conspiracy members if subpoenas are used; and 7) the inability of pen registers and other phone records to disclose the details of conversations.  Campos, 541 F.3d at 747-48; United States v. Carter, 449 F.3d 1287, 1294 (D.C. Cir. 2006); United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000); United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986).

A-0073-15T1

Even if law enforcement has already gathered sufficient evidence to indict one perpetrator through other means, the necessity requirement may be fulfilled where the application demonstrates that the government has "limited knowledge of the full extent of [that perpetrator's] criminal activities and his coconspirators" and can gain more evidence by intercepting communications. Perez, 661 F.3d at 582. This is because "the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses." McGuire, 307 F.3d at 1198 (footnote omitted).

Here, the judge concluded that Camilleri's affidavit "presented an adequate basis to establish that normal investigative techniques had been inadequate to identify many of the co-conspirators and the full extent of the conspiracy." The judge took note of Camilleri's experience with similar investigations, and found that the detective "presented a convincing explanation of the need to intercept wire communications" in this matter. He found that although other investigative methods had implicated Stevenson in drug and weapons offenses, they "did not allow . . . law enforcement agents to penetrate [his] network" or to "obtain information about the extended organization, such as other members, couriers, buyers, and suppliers." The judge also found that Camilleri provided adequate reasons why other as yet untried methods, such as

16

search warrants and grand jury subpoenas, would not have been helpful at the time the wiretap warrant was sought.

The judge did not abuse his discretion by denying the motion to suppress evidence obtained using the wiretaps, and we further conclude that the judge did not abuse his discretion when he determined that the wiretap warrant was based on necessity. The mere fact that certain traditional investigatory techniques, including Deaney's undercover work, the CIs, physical surveillance, and others, revealed evidence sufficient to prosecute Stevenson for some offenses did not negate a finding of necessity. These methods were partially effective, but likely would not have assisted detectives any further in identifying Stevenson's heroin suppliers, all of his lower-level dealer customers, any user customers, or other co-conspirators. Further, Camilleri's application did not contain conclusory or boilerplate statements, and instead included details specific to this investigation. The application demonstrated a good faith effort to utilize other investigative techniques before resorting to wiretapping.

Stevenson argues that the court erred by denying his requests to reveal the identity of the CI who introduced Deaney to him. He asserts that the CI was "directly involved or played an integral role in the crimes at issue" and that therefore disclosure would have been proper. Substantial deference is given to

17

a judge's evidentiary rulings. State v. Sessoms, 413 N.J. Super. 338, 342 (App. Div. 2010). A trial judge's decision denying a motion to disclose the identity of a CI is reviewed for abuse of discretion. State v. Milligan, 71 N.J. 373, 384 (1976).

"Protecting the identity of [CIs] is a privilege afforded the State in recognition of its compelling need to protect its sources of information concerning criminal activity." State v. Brown, 170 N.J. 138, 149 (2001). The purpose of this privilege is to promote communications by citizens to law enforcement about their knowledge of wrongdoing by offering "anonymity to avoid both retribution and social ridicule." State v. Infante, 116 N.J. Super. 252, 257 (App. Div. 1971).

To that end, a witness may "refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of . . . the laws of this State or of the United States" to a government representative charged with the duty of enforcing those laws. N.J.S.A. 2A:84A-28; N.J.R.E. 516. Evidence of a CI's identity is "inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his [or her] identity is essential to assure a fair determination of the issues." N.J.S.A. 2A:84A-28; N.J.R.E. 516.

When deciding whether to order disclosure of a CI's identity, a judge must weigh – on a case-by-case basis – the State's interest in protecting the informant against the defendant's need for the information, State v. Adim, 410 N.J. Super. 410, 434 (App. Div. 2009), "taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Roviaro v. United States, 353 U.S. 53, 62 (1957). "Without a strong showing of need, courts will generally deny a request for disclosure." State v. Florez, 134 N.J. 570, 578 (1994). A judge need not order disclosure simply because a defendant wishes "to test the truth of [an] officer's statement that there is [a CI] or as to what the [CI] related or as to the [CI's] reliability." State v. Burnett, 42 N.J. 377, 385 (1964).

However, the State cannot invoke the privilege if the CI is an "essential witness on a basic issue in the case" or an "active participant in the crime for which the defendant is on trial," or when "fundamental principles of fairness" mandate disclosure. Florez, 134 N.J. at 579. Even if the CI's safety would be compromised, that fact cannot surmount the need for trial fairness when "disclosure is material to the defense and to a balanced presentation of essential issues." Id. at 582.

Where the courts have required disclosure of a CI's identity, "the factual complex generally involves situations where the informant was an actual participant in the precise criminal act for which the accused is being charged." Infante, 116 N.J. Super. at 258. For example, in Florez, 134 N.J. at 578-91, our Supreme Court concluded that the trial judge erred in refusing to order disclosure of two CIs' identities, because both played "a central and critical part" in the commission of the crimes charged. There, the CIs singled out the defendants as targets of law enforcement's reverse sting operation and arranged a meeting with the defendants for a drug purchase. Id. at 576-591. At the meeting, one CI sold drugs to the defendants. Id. at 577. The Court found that the CIs' credibility was "pivotal" to the case, particularly since the "primary evidence" of the drug transaction was founded solely on the account of the seller CI, who was the only witness besides the defendants. Id. at 581. The Court concluded that the CIs' names and addresses should have been disclosed, to allow the defendants to potentially gather information that could impeach their credibility. Ibid. See also Maudsley v. State, 323 N.J. Super. 579, 594 (App. Div. 1999) (explaining that nondisclosure was improper where the CI was the only person who participated in a "bogus" drug transaction that formed sole basis of search warrant application).

By contrast, where a CI "plays only a marginal role, such as providing information or 'tips' to the police or participating in the preliminary stage of a criminal investigation," denial of disclosure of his or her identity is proper. Milligan, 71 N.J. at 387. "Proof that the informer witnessed the criminal transaction, without more, is usually considered insufficient to justify disclosure." Id. at 388. Further, where the CI's role "is confined to introducing the undercover agent to [the] defendant, the majority of decisions have refused to compel disclosure of the informer's identity." Id. at 388-89. Generally, "when an informer does not testify and was not involved in the crime, information that would be relevant to impeach the informer's credibility has no bearing on the issues at trial" and the defendant thus cannot demonstrate sufficient "need" to justify disclosure. Adim, 410 N.J. Super. at 434-35.

In Milligan, 71 N.J. at 388-90, the CI introduced an undercover agent to the defendant, but because the CI was not the purchaser and did not induce the defendant to make the drug sale, the Court found no error in the trial judge's denial of disclosure. See also State v. Oliver, 50 N.J. 39, 41-42 (1967) (indicating that nondisclosure was proper where CI accompanied undercover agent to a bar to shield him from suspicion, but played no part in the crimes charged); State v. Williams, 364 N.J. Super. 23, 40 (App. Div. 2003) (stating

21

that nondisclosure was proper where CI called defendant to arrange drug deal, but deal never occurred and CI was not involved in the drug possession charges against defendant); State v. Salley, 264 N.J. Super. 91, 98-101 (App. Div. 1993) (reversing an order requiring disclosure where CI "lur[ed]" defendant to bring a gun out of his apartment but otherwise was "no more than a witness to the criminal event"); State v. Varona, 242 N.J. Super. 474, 479-80 (App. Div. 1990) (explaining that nondisclosure was proper where CI introduced undercover officer to defendant and told him when defendant had drugs ready, but "did not negotiate, conduct or set up any of the sales").

Additionally, the privilege is no longer applicable after the CI's identity "has been disclosed to those who would have cause to resent" that person's assistance to the government. Roviaro, 353 U.S. at 60. But because the privilege belongs to the State and not to the CI, only disclosure by the State may void it. Sessoms, 413 N.J. Super. at 343-44. For example, in Sessoms, we found that there was no "disclosure" sufficient to void the privilege where the CI submitted an affidavit identifying himself by name and exculpating the defendant. Id. at 342-44. We reversed the trial judge's order requiring the State to "confirm or deny" whether the person who submitted the affidavit was indeed the CI. Id. at 340-41. In Williams, 364 N.J. Super. at 38, we found that the

22

State did not waive the privilege where the defendant remembered the CI who called him to set up a drug sale where he was subsequently arrested. See also Salley, 264 N.J. Super. at 101-02 (stating that disclosure was not required although the CI's identity was "only thinly concealed").

On August 2, 2013, Stevenson requested disclosure of the identities of two CIs referenced by detectives during grand jury proceedings. He argued that the CI, who introduced Deaney to Stevenson, was "directly involved on multiple occasions with the investigation" and could be "an essential witness" since police relied on information he provided. Through counsel, Stevenson indicated that he had guessed who this CI was, and that the CI was "a criminal" who stole and forged checks in Stevenson's name. Essentially, Stevenson asked not that the CI's identity be disclosed to him, but that he be permitted to reveal the CI's identity to the jury at trial, thus utilizing information about his criminal activities to impeach the State witnesses' testimony that the CI was a reliable informant.

The judge found that the CI "was not an actual participant" in any crime with which Stevenson was charged, because he "merely set up and witnessed the first two meetings" between Stevenson and Deaney. He noted that while the CI directly purchased heroin from Stevenson on one subsequent occasion, Stevenson was not charged with that transaction. Additionally, the CI was

present during one of the gun purchases at Stevenson's request, not the State's. The judge found that this "limited involvement . . . [did] not sufficiently outweigh the State's interest in protecting the free flow of information." He also found that the CI's identity need not be disclosed based on "fundamental fairness," because Stevenson had not made a "strong showing of need."

At trial, defense counsel asked Deaney if the CI was "somebody Mr. Stevenson obviously knew," and Deaney answered, "I would assume so." Counsel then asked the judge if she could say the CI's name, and the judge told her she could not. She instead asked Deaney whether the CI was "involved in supplying drugs to smaller-level drug dealers," and Deaney said he did not know. Later, on re-cross examination, counsel asked Deaney if the CI had agreed to assist investigators "to try to avoid going to jail," and Deaney again said he did not know. Counsel continued to ask questions about the CI, and the court sustained the State's objection and told counsel she could not ask any further questions that could reveal the CI's identity.

On April 22, 2015, Stevenson moved to recall Deaney to permit further cross-examination regarding the CI, and for permission to cross-examine other State witnesses on that subject. During a hearing on April 23, 2015, defense counsel reiterated that Stevenson knew who the CI was, and argued that three

State witnesses had mentioned the CI's name and spoken about his activities during the investigation. For example, one of Stevenson's associates, Kenrick Crawford, testified, using the CI's name, that Stevenson borrowed the CI's car to go to Newark on August 1, 2011. However, neither Crawford nor any other witness described the man they named as a CI or identified him as the person who introduced Deaney to Stevenson.

Counsel requested permission to question Deaney and Camilleri about the CI again, this time using his name. She specifically wanted to ask about the fact that the CI was charged with conspiracy to distribute CDS, theft, and forgery, to impeach the detectives' reliance on information from him. The court found that counsel could cross-examine detective witnesses about their interactions with the CI but that she was "foreclosed from getting into" the CI's identity in keeping with the 2013 denial of Stevenson's prior motion. The judge told counsel she could question witnesses about the charges against the CI to impeach the witnesses' testimony, but that she could only refer to him as "the confidential informant."

Counsel abided by that ruling, and later solicited testimony from Camilleri that the CI was charged with racketeering. She questioned the detective as to whether he would "want to gather information from a person who's a dishonest

person."  Counsel also made references to the CI's criminal activities during her closing statement, calling his reliability as an informant into question.  She urged the jury not to "ignore" the issue of the CI's credibility.

We conclude that the judge did not abuse his discretion by denying Stevenson's motions to reveal the CI's identity to the jury.  Although Stevenson may have guessed who the CI was, this knowledge was not a result of a disclosure by the State; thus the State did not waive its privilege to protect the CI's identity.  The judge properly found that the CI was not an active participant in the crimes charged and his identity was not crucial to Stevenson's defense.  As in cases like Milligan, the CI introduced Stevenson to an undercover agent and witnessed some of the charged crimes, but did not buy the drugs, induce any sales, or otherwise participate.  Finally, nondisclosure to the jury of the CI's name does not appear to have hampered Stevenson's defense, since counsel was nevertheless able to cross-examine key State witnesses about the CI's criminal activities and thus impugn his credibility and detectives' reliance on him.

Stevenson next argues that certain remarks made by the prosecutor during summation deprived him of a fair trial.  He complains that the prosecutor stated that 1) defense counsel "humiliated witnesses on cross-examination," which cast aspersions upon him and counsel, and 2) he did not attack Camilleri's warrant

26

application on probable cause grounds, which improperly implied that he had the burden of production and proof at trial. He contends that the court erred by declining to grant a mistrial or to issue curative instructions because of these comments.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented," and are "expected to make vigorous and forceful closing arguments to juries." State v. Frost, 158 N.J. 76, 82 (1999). However, a prosecutor "must refrain from improper methods that result in a wrongful conviction . . . ." State v. Smith, 167 N.J. 158, 177 (2001).

For example, prosecutors must not "make inaccurate legal or factual assertions," and must "confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." Id. at 178. A prosecutor is also "not permitted to cast unjustified aspersions on the defense or defense counsel." Id. at 177. Further, he or she may not comment upon a defendant's failure to testify or remark that the State's evidence was "uncontradicted" or that the defendant failed to produce witnesses on his or her behalf. State v. Engel, 249 N.J. Super. 336, 381-82 (App. Div. 1991).

 A-0073-15T1

However, if a prosecutor's remarks "are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" Smith, 167 N.J. at 178 (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). A prosecutor may fairly comment upon defense counsel's tactics and respond "in order to 'right the scale.'" Engel, 249 N.J. Super. at 379 (quoting United States v. Young, 470 U.S. 1, 13 (1985)). "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses," State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000), and a response may be appropriate even if it "tends to undermine the defense case." State v. Nelson, 173 N.J. 417, 473 (2002).

Moreover, a finding of prosecutorial misconduct "does not end a reviewing court's inquiry; in order to merit reversal, the misconduct must have deprived the defendant of a fair trial." Hawk, 327 N.J. Super. at 281. A prosecutor's misconduct must generally be "egregious," State v. Echols, 199 N.J. 344, 360 (2009), and substantially prejudice the defendant's right to the jury's evaluation of the merits of his defense. Smith, 167 N.J. at 181-82. An appellate court "must assess the prosecutor's comments in the context of the entire trial record," Nelson, 173 N.J. at 472, including whether the trial was lengthy and the

A-0073-15T1

prosecutor's remarks short or "errant." Engel, 249 N.J. Super. at 382. Further, where a prosecutor's comments are "only slightly improper," a general jury charge to the effect that statements during summation are not evidence and should be disregarded if they conflict with jurors' recollection of events "may serve to ameliorate potential prejudice." Frost, 158 N.J. at 86-87.

During his summation, the prosecutor discussed Crawford's testimony, conceding that he was a drug user who was "down on his luck." The prosecutor said Crawford was thrown out of his house by his mother, and continued:

> How many times was he asked to go through that? Now, think about the cross-examinations and where they went sometimes. Are these intended to try to hurt their credibility or try to humiliate someone? Because humiliating somebody on the stand doesn't do anything to affect their credibility whether or not they are telling the truth.

Later, the prosecutor commented that defense counsel questioned Camilleri about whether co-conspirators arrested on charges of racketeering were simply heroin buyers. The prosecutor noted that Camilleri submitted an affidavit in support of issuance of the arrest warrants, and said:

> The probable cause on that arrest affidavit was never attacked. . . . No inconsistencies shown. It wasn't alleged he lied in it. It wasn't alleged he said anything other than what he testified to on the stand. So that whole line [of questioning] by [defense counsel], charged this person with racketeering, charged that

person with racketeering, he was up front about all of
it.  He told you.

Stevenson did not object at the time of the summation.

The next day, Stevenson moved for a mistrial or a curative instruction, arguing that the prosecutor had "disparag[ed]" the defense and improperly implied that he had the burden of proof to challenge Camilleri's affidavit.  The prosecutor explained that he had intended to make a "fair comment" on counsel's cross-examination of Crawford, in which she brought up the facts that his mother threw him out of her house and that he was made fun of in school, because he felt that those questions were irrelevant to the case and Crawford's credibility. He said that he mentioned the arrest affidavit to rebut counsel's implication during cross-examination that Camilleri "overcharg[ed] his case" against various co-conspirators.

The judge found that the prosecutor's remarks "were totally fair comment within the context of everything that [had] occurred in the course of [the] trial." He also found that the defense had adopted tactics that "were directly related to what [Stevenson was] claiming that the prosecutor inappropriately commented on."  As a result, he denied the motion.  Later, the judge instructed the jury that "[a]rguments, statements, remarks, openings and summations of counsel . . . must not be treated as evidence."

The prosecutor's characterization of defense counsel's cross-examination of Crawford as "humiliating" was not so egregious as to deprive Stevenson of a fair trial. Rather, this comment was a fair response to the defense's tactics in trying to discredit Crawford; the prosecutor simply attempted to "right the scale" by stating that the drug use and school and family issues divulged on cross-examination had no bearing on his credibility.

The prosecutor's comment that Camilleri's affidavit of probable cause for the arrest warrants was "never attacked" is a fair response to defense counsel's suggestion that Camilleri overcharged co-defendants – and thus possibly Stevenson himself – and as a proper attempt to repair Camilleri's credibility. Even if the prosecutor's statement was improper, the comment was not long or inappropriately forceful, particularly considering the length of the trial and the summation itself, and the overall strength of the evidence against Stevenson. The prosecutor's comments did not deprive Stevenson of a fair trial.

Stevenson argues that the trial court erred by failing to engage in a colloquy with him about whether he wanted to testify, and by instead relying on his counsel's statement that he did not intend to do so. Relatedly, he argues that the court erred in ruling that if he did testify, his prior convictions would be admissible to impeach him. Stevenson asserts that the court did not properly

31

balance the remoteness of his convictions and the nature of the crimes to determine whether the relevance to his credibility outweighed potential prejudice.

In general, a judge's evidentiary rulings are entitled to deference and are reviewed under an abuse of discretion standard. State v. Harris, 209 N.J. 431, 439 (2012). More specifically, "whether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge." State v. Sands, 76 N.J. 127, 144 (1978). "Ordinarily evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant." Ibid.

N.J.R.E. 609(a) permits the admission of a witness's prior convictions for impeachment purposes. If the witness is a defendant in a criminal case and the prior conviction is "the same or similar to one of the offenses charged" or "the court determines that admitting the nature of the offense poses a risk of undue prejudice," the State may only present the crime's degree, the date of conviction, and the sentence imposed. N.J.R.E. 609(a)(2). This rule is intended to ensure that a prior offender does not appear to be "a citizen of unassailable veracity," while also protecting a defendant against "the risk of impermissible use by the jury of prior-conviction evidence." State v. Brunson, 132 N.J. 377, 391 (1993).

If more than ten years have passed since the prior conviction or the witness's release from confinement, evidence of that conviction is only admissible if the judge determines that its probative value outweighs its prejudicial effect, with the burden of proof on the proponent of the evidence. N.J.R.E. 609(b)(1). In determining whether such a conviction is admissible, the court may consider whether there have been intervening convictions; the number, nature, and seriousness of the intervening offenses; whether the conviction involved a crime of dishonesty or fraud; how remote the conviction is in time; and the seriousness of the crime. N.J.R.E. 609(b)(2).

"Remoteness cannot ordinarily be determined by the passage of time alone," since "[a] jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand . . . ." Sands, 76 N.J. at 144-45. A court therefore must conduct a balancing test to determine whether the conviction's relevance with respect to credibility outweighs any prejudice to the defendant. Id. at 144. Regardless, if an older conviction is deemed admissible for impeachment purposes it must be "sanitized" in accordance with N.J.R.E. 609(a)(2).

Here, the prosecutor stated that he intended to use Stevenson's criminal history for impeachment purposes if Stevenson testified. On April 22, 2015, he

provided the court with a copy of Stevenson's criminal history, which included a 2007 conviction of aggravated manslaughter and four 1996 convictions of conspiracy, possession of CDS, and two counts of possession of CDS with intent to distribute.

The judge held a hearing on the admissibility of all of Stevenson's convictions for impeachment purposes. The prosecutor agreed that all of the charges should be "sanitized" and said that he would mention only the indictment numbers, degrees of the charges, dates of the convictions, and sentences. He argued that the 1996 convictions were not unduly remote in time because Stevenson committed manslaughter related to the 2007 conviction very soon after he completed his sentence for those earlier crimes. He also noted that Stevenson began the criminal activity that was the subject of the current trial less than a year after completing his 2007 sentence.

The judge found that all of the convictions would be admissible against Stevenson if he testified, concluding that they were "in no way remote" because he had "scarcely had a year out of custody [on] any of these matters when he did not get in trouble again." The judge asked counsel whether Stevenson would "proceed[] forward or rest[]," and she said he planned to rest.

We see no abuse of discretion.  The 2007 conviction was admissible under N.J.R.E. 609 because it involved a charge different from any that he currently faced.  The judge also properly balanced the remoteness of the 1996 convictions against the possible prejudice to Stevenson.  The court's finding that Stevenson's intervening 2007 conviction and the fact that he had not spent more than a year out of custody without committing any offenses since 1996 was in keeping with N.J.R.E. 609(b) and Sands.  Further, the State agreed to present only a sanitized version of Stevenson's history, in accordance with N.J.R.E. 609(a)(2).

The right of a criminal defendant to testify on his or her own behalf is essential to due process and may only be waived knowingly and voluntarily. State v. Ball, 381 N.J. Super. 545, 556 (App. Div. 2005).  The courts have recognized that it is "the better practice for the court to determine on the record whether a defendant wishes to testify or to waive that right."  State v. Lopez, 417 N.J. Super. 34, 39 (App. Div. 2010).

However, "when a defendant is represented by counsel, the court need not engage in a voir dire on the record" to establish a waiver.  Ball, 381 N.J. Super. at 556.  It is the responsibility of defense counsel, not the trial court, to advise the defendant on whether to testify.  State v. Savage, 120 N.J. 594, 630 (1990). To ensure that counsel meets this obligation, it may be the "better practice" for

a court to inquire whether counsel has advised a defendant of the right to testify. Id. at 631. Ultimately, the decision whether to testify is "an important strategical choice, made by defendant in consultation with counsel." Ibid.

During a charge conference on April 30, 2015, the judge noted that because Stevenson did not testify, there would be no mention of his prior convictions in any instruction on entrapment. On May 6, 2015, defense counsel verified with the judge that he would give an instruction to the jury not to make a negative inference about Stevenson's decision not to take the stand. The judge asked Stevenson whether he knew he had a right to testify and whether counsel had discussed the decision not to do so with him. Stevenson replied that he "was going to testify" and "wanted to," but that the judge had "pushed [him] away from" doing so by ruling that the prosecutor could present his criminal record. He said that the court "made that decision for [him]." The judge found that Stevenson spoke to his attorney and decided not to testify based on the ruling as to his prior convictions.

Counsel represented Stevenson, who freely made the strategic choice not to testify to avoid the presentation of his criminal history to the jury. The judge properly relied on defense counsel's statement that the defense would rest without his taking the stand. Thus, there was no error.

In a pro se supplemental brief, Stevenson argues that the court erred by failing to acquit him on the weapons-related charges on grounds of due process entrapment. He asserts that Deaney initiated the gun sales and that therefore police "created the crime[s]" and "controlled and directed" their commission. Stevenson states that the police had no prior evidence that he was involved with possessing or selling illegal guns. As a result, he argues that the trial court erred by not addressing the question whether he was subjected to due process entrapment.

A defense of entrapment can arise "whenever a defendant introduces evidence of the government's involvement in the crime through initiation, solicitation, or active participation." State v. Johnson, 127 N.J. 458, 464 (1992). "Subjective" entrapment involves the defendant's predisposition to commit the charged crime, while "objective" entrapment concerns the wrongfulness of the government's actions. Ibid. N.J.S.A. 2C:2-12 sets forth the elements a defendant must prove to the jury by a preponderance of the evidence in order to establish the affirmative defense of entrapment. This "statutory defense" requires a showing of both wrongful inducement by the State and a lack of predisposition. Johnson, 127 N.J. at 468-69.

However, a defendant may raise an entrapment defense "based on standards of due process" even where all of the requirements of N.J.S.A. 2C:2-12 are not met. Id. at 469. This "due process entrapment," which is an issue of law to be resolved by the court, "concentrates exclusively on government conduct and the extent of the government's involvement in commission of the crime." Florez, 134 N.J. at 584. The "essence" of this defense is that the government has engaged in "egregious or blatant" wrongful conduct that has induced and increased crime rather than detecting or deterring it. Johnson, 127 N.J. at 470-71.

The defendant has the burden to present evidence in support of a due process entrapment defense, but once he has done so, the State has the burden to show that entrapment has not occurred by clear and convincing evidence. Florez, 134 N.J. at 590. This is because in cases of due process entrapment, the State has allegedly "created the situation that is under scrutiny" and has "far more control over the evidence relevant to proving or disproving" that entrapment occurred. Ibid.

Police "should ordinarily have a reasonable suspicion that the targeted defendant would be likely to engage in the commission of the crime

contemplated." Id. at 587. Factors relevant to the analysis of due process entrapment include:

> (1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.
>
> [Johnson, 127 N.J. at 474.]

Further, the court may consider whether law enforcement engaged in tactics like "heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need; [or] the promise of exorbitant gain . . . ." Id. at 478. Ultimately, the standard is "whether the police involvement in bringing about the crime was patently wrongful." Id. at 482.

Cases where due process entrapment has been found have involved deep and widespread engagement by law enforcement in creating, planning, and carrying out the crime. See, e.g., Florez, 134 N.J. at 585-89 (requiring retrial where police, on uncorroborated information from CIs, organized a "reverse sting" and sold cocaine to the defendants); State v. Grubb, 319 N.J. Super. 407,

39

410-11 (App. Div. 1999) (reversing conviction where police arrested defendant after receiving information from unsupervised CI who organized prescription drug sales).

By contrast, in Johnson, 127 N.J. at 461, the Court found no due process entrapment where law enforcement developed a "plan" to give the defendant, a known buyer and user of cocaine, "the opportunity to steal drugs from a drug dealer and to sell those drugs." This action was based on another CI's account that the defendant once said he would commit such a crime if he had the chance. Ibid. Although the informant "presented and explained the scheme" to the defendant, the defendant thereafter "actively engaged in the discussions and refinement of the plan" and added key details. Id. at 462.

Here, Deaney testified that during a phone conversation with Stevenson, Stevenson commented that he had some "explosive" heroin. The detective admitted that he raised the subject of buying a handgun based on his misunderstanding of the word "explosive" to mean that Stevenson had weapons to sell. Camilleri testified that, to his knowledge, Stevenson did not have any guns to sell. Stevenson requested a charge on statutory entrapment, and the court gave one. However, Stevenson did not raise due process entrapment before the judge.

We conclude that the situation in this case is more akin to that in <u>Johnson</u>. Although Deaney may have brought up the subject of firearms, Stevenson immediately confirmed that he could facilitate an illegal gun sale and engaged in all of the planning and execution of the crime. Stevenson contacted Castro and arranged the meeting where Castro sold the first gun to Deaney. After that, the State had reasonable suspicion that Stevenson was involved in weapons trafficking, and Deaney's inquiry whether he could buy more guns was not "heavy handed pressure." Stevenson readily agreed to organize another sale, and police had no involvement with Stevenson's arrangement with Taylor for the second gun transaction. Thus, the State's actions in its investigation did not rise to the level of "egregious wrongful conduct" necessary for a finding of due process entrapment.

Finally, Stevenson argues that his sentence is excessive. He asserts that the court's aggregate sentence of fifty years in prison was inappropriate, and that the trial judge improperly tried to "make up for" the acquittal of the first-degree leader of a trafficking network charge. He also argues that the trial judge should not have found aggravating factor five because "[t]he claimed organized criminal activity was already part and parcel of the offenses charged against defendant and heard at trial." Stevenson contends that the judge erred in

41

imposing consecutive sentences, because all of his crimes were part of a "single, though lengthy, period of aberrant behavior."

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). A trial judge enjoys "considerable discretion in sentencing." State v. Blann, 429 N.J. Super. 220, 226 (App. Div. 2013), rev'd on other grounds, 217 N.J. 517 (2014). An appellate court first must review whether the sentencing court followed the applicable sentencing guidelines. State v. Natale, 184 N.J. 458, 489 (2005). The Code of Criminal Justice sets forth ranges within which a defendant may be sentenced for each degree of crime. State v. Case, 220 N.J. 49, 63 (2014).

Here, the judge merged most of the ninety-one counts, leaving eight for sentencing.[2] N.J.S.A. 2C:44-3 grants a sentencing court discretion to impose an

---

[2] The judge imposed a sentence of twenty years in prison with a ten-year period of parole ineligibility on count three; ten years with a five-year period of parole ineligibility on count four, second-degree conspiracy to distribute CDS; ten years with a five-year period of parole ineligibility on count eighty-three, second-degree distribution of CDS; five years with a two and a half-year period of parole ineligibility on count 102, third-degree distribution of CDS; five years on count 124, second-degree unlawful possession of an assault firearm; five years with a forty-two-month period of parole ineligibility on count 126, second-degree unlawful sale of an assault firearm; eighteen months on count 132, fourth-degree possession of a prohibited weapon – large capacity magazine; and

A-0073-15T1

extended term if he is a "persistent offender"; Stevenson met the criteria due to his prior drug-related convictions.  N.J.S.A. 2C:43-7(a)(3) provides that for second-degree crimes, the court may impose an extended term between ten and twenty years.  As a result, the twenty-year term imposed on Stevenson under count three was proper.  The remaining sentences also fell within the appropriate sentencing ranges under N.J.S.A. 2C:43-6: between five and ten years for the second-degree charges, between three and five years for the third-degree charge, and eighteen months for the fourth-degree charges.  Indeed, Stevenson's sentences on the second-degree weapons charges were at the bottom of the range.

A reviewing judge next must ensure that any aggravating factors found by the trial judge under N.J.S.A. 2C:44-1 are based upon sufficient credible evidence in the record.  State v. Miller, 205 N.J. 109, 127 (2011).  If the factors found by the trial judge are so grounded, the sentence must be affirmed even if the reviewing court would have reached another result.  State v. O'Donnell, 117 N.J. 210, 215 (1989).  A judge "must qualitatively assess" the factors it finds, and assign each an "appropriate weight."  Case, 220 N.J. at 65.  An appellate

---

eighteen months on count 134, fourth-degree unlawful sale of a large capacity magazine.

A-0073-15T1

court may remand for resentencing where the trial judge fails to provide a qualitative analysis of the relevant factors, or if the trial judge "considers an aggravating factor that is inappropriate to a particular defendant or to the offense at issue." State v. Fuentes, 217 N.J. 57, 70 (2014).

Under N.J.S.A. 2C:44-1(a)(5), one aggravating factor exists when "[t]here is a substantial likelihood that the defendant is involved in organized criminal activity." In finding this factor, the court here stated that "the proofs in this case clearly indicated [Stevenson] was involved clearly in organized criminal activity." The court based this finding on the fact that this was "not some street corner seller of drugs a bag at a time" and that Stevenson's crimes involved "wholesale lots of heroin."

We see no error in the judge's application of aggravating factor five. He did not "double count" any element of a crime of which Stevenson was convicted. Although he was charged as the leader of a criminal enterprise, the jury acquitted him of that offense, and none of the remaining charges involved an element of organization. See State v. Pych, 213 N.J. Super. 446, 460-61 (App. Div. 1986) (upholding application of factor five where defendant was convicted of conspiracy to promote gambling, since involvement in organized crime was not an element of either conspiracy or the underlying offense).

N.J.S.A. 2C:44-5(a) provides that when multiple sentences are imposed on a defendant for more than one offense, these sentences "shall run concurrently or consecutively as the court determines at the time of sentence . . . ." The statute states that there "shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses." Ibid. In State v. Yarbough, 100 N.J. 627 (1985), our Supreme Court set forth guidelines for deciding whether consecutive sentences are appropriate. It held that certain criteria must be considered "when sentence is pronounced on one occasion on an offender who has engaged in a pattern of behavior constituting a series of separate offenses or committed multiple offenses in separate, unrelated episodes." Id. at 644.

The first five criteria are as follows:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominately independent of each other;

> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors;
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [Id. at 643-44.]

If a sentencing court properly evaluates the Yarbough factors, the court's decision will not usually be disturbed on appeal. Miller, 205 N.J. at 129. However, remand may be needed if a court does not explain why consecutive sentences are warranted and there is no way to deduce or discern the court's reasoning on appeal. Id. at 129-30. See also State v. Miller, 108 N.J. 112, 122 (1987) (remanding for resentencing where the trial court did not provide "a separate statement of reasons" to impose consecutive sentences).

Here, the judge found that "every count that [Stevenson would] be sentenced on represent[ed] a complete separate and distinct criminal offense." The judge stated that there was "a pattern of criminal behavior . . . that went on for a significant period of time" and that Stevenson was responsible for "a good portion" of the heroin distribution in Monmouth County. He also said that as to the gun sales, these were "separate and distinct transactions, and under Yarbough there are no free crimes." However, the court did not analyze the Yarbough factors, particularly factor three, before imposing consecutive sentences on counts three, four, and eighty-three, and sentences on counts 102, 124, 126, 132, and 134 that were to run concurrent to each other and to count eighty-three, but to run consecutive to counts three and four. We therefore remand for resentencing, with a direction to the judge to consider whether the Yarbough factors support the imposition of consecutive sentences and to provide a more detailed analysis of those factors.

## II.

On appeal, Taylor makes the following arguments:

> POINT I
> THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO SELF-REPRESENTATION WHEN IT DENIED THE DEFENDANT'S MOTION TO PROCEED PRO SE.

47

POINT II

OPINION TESTIMONY BY INVESTIGATING OFFICERS ABOUT THE MEANING OF INTERCEPTED COMMUNICATIONS AND WHETHER OBSERVATIONS CONSTITUTED NARCOTICS TRANSACTIONS WAS INADMISSIBLE AND IMPROPERLY INVADED THE PROVINCE OF THE JURY, THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

A. The Testimony at Issue.

B. Testimony About The Meaning Of Coded Language And Intercepted Conversations Was Not The Proper Subject of Lay Opinion.

C. Opinion Testimony About The Witnesses' Beliefs That They Observed Defendant With Heroin or Observed Individuals Conduct Narcotics Transactions Was Completely Inadmissible.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL ON THE BASIS THAT THE COURT HAD IMPROPERLY CHASTISED DEFENSE COUNSEL IN THE PRESENCE OF THE JURY FOR OBJECTING DURING THE STATE'S SUMMATION.

POINT IV

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND MUST BE REDUCED.

48

Taylor argues that the court violated his right to represent himself at trial. He contends that the trial judge did not engage in the required colloquy to determine whether he was knowingly and voluntarily waiving his right to counsel, and that this error requires a new trial. The State agrees that the court erred and that a new trial is necessary.

"[A] defendant has a constitutionally protected right to represent himself in a criminal trial." Faretta v. California, 422 U.S. 806, 816 (1975). However, because a waiver of the right to counsel constitutes a relinquishment of "many of the traditional benefits associated with" that right, it must be made "knowingly and intelligently." Id. at 835. When a criminal defendant requests to proceed pro se, the judge must "engage in a searching inquiry" with him to determine whether he understands the implications of the waiver. State v. Crisafi, 128 N.J. 499, 510 (1992).

In Crisafi, the Court held that a trial judge must inform defendants of "the nature of the charges against them, the statutory defenses to those charges, and the possible range of punishment." Id. at 511. The judge should also tell defendants of "the technical problems they may encounter in acting as their own counsel and of the risks they take if their defense is unsuccessful." Id. at 511-12. Defendants should be cautioned that they must conduct their defense in

accordance with the relevant rules of procedure and evidence, that "a lack of knowledge of law may impair their ability to defend themselves," and that in general it may be unwise not to accept counsel's assistance.  Id. at 512.

In State v. Reddish, 181 N.J. 553, 594 (2004), the Court expanded the inquiry to include areas such as

> whether defendant will experience difficulty in separating his roles as defendant and counsel; whether defendant understands that he not only has the right not to testify, but also the right not to incriminate himself in any manner; whether he understands that he could make comments as counsel from which the jury might infer that he had knowledge of incriminating evidence (and the difficulty in avoiding such comments); and whether he fully understands that if he crosses the line separating counsel from witness, he may forfeit his right to remain silent and subject himself to cross-examination by the State.

In ascertaining whether a defendant's "knowingness" is "real or feigned," a court should ask "appropriate open-ended questions that will require [the] defendant to describe in his own words his understanding of the challenges that he will face . . . ."  Id. at 594-95.

Ultimately, the focus "must be on the defendant's actual understanding of the waiver of counsel."  Crisafi, 128 N.J. at 512.  All reasonable presumptions against waiver should be indulged.  State v. Gallagher, 274 N.J. Super. 285, 295 (App. Div. 1994).  However, a defendant should not be deprived of the right of

self-representation based solely on "the complexity of the proceedings or the magnitude of the consequences" he faces. State v. Russo, 243 N.J. Super. 383, 401 (App. Div. 1990). Additionally, the goal of the court's colloquy with a defendant is not to explore whether he possesses any particular "technical legal knowledge," State v. King, 210 N.J. 2, 19 (2012), and a defendant need not demonstrate "the skill and experience of a lawyer" before a knowing and voluntary waiver is found. Reddish, 181 N.J. at 595. Finally, if the appropriate colloquy is conducted and it is determined that the defendant's waiver of counsel is knowing and voluntary, that choice "must be honored" even if the court feels it is a "poor" or "unwise" one. Gallagher, 274 N.J. Super. at 296; State v. Thomas, 362 N.J. Super. 229, 242-43 (App. Div. 2003).

On July 31, 2014, Taylor moved to proceed pro se. The trial judge adjourned the matter, explaining that there needed to be a hearing to decide whether he was "capable of representing [him]self." The judge "strenuously suggest[ed]" that Taylor "have a very long conference with [his] attorney and rethink [his] position."

On January 8, 2015, the court held the hearing on Taylor's motion, and began by stating that Taylor was one of three remaining defendants in the matter who did not "cut their losses and . . . move[] on with their lives" by accepting a

plea deal. The court then informed Taylor that, at trial, he would face up to 103 years' imprisonment if convicted and given maximum sentences. Taylor stated that he nevertheless wanted to proceed pro se, because he believed the charges against him to be "false" and felt his counsel was "not representing [him] to [his] satisfaction."

The judge asked Taylor to name the charges against him, while saying that if he wanted to "get rid of [his] attorney" he would need to "be smarter than" the attorney. The judge also questioned whether Taylor had been "listening to the brain trust over in the jail" and if that was why he had made his motion. Taylor knew that he was charged with racketeering and possession of CDS, but he did not know the rest of his charges "off hand." When the judge asked what defenses were available, Taylor replied that he was "not guilty of the charges" and that he knew "the burden of proof [was] on the prosecution" to establish his guilt.

Next, the judge informed Taylor that if he proceeded pro se, his attorney would remain available as standby counsel but could not offer legal advice. The judge opined that his "sense" of the matter was that eventually Taylor would want "to get [counsel] to do his lifting for him." Taylor said, "I will defend myself," but asked whether counsel's answering of legal questions could be considered giving legal advice.

The judge said that Taylor was "clearly not listening," and had "failed to grasp the legal concept of cutting [his] losses and getting on with [his] life."  He further said that Taylor would "be the first one yelling like crazy if [he got] convicted in this matter . . . and [went] to jail for the rest of [his] life."  Taylor stated, "I'm fully aware of it and I'm willing to take my responsibility.  I don't have any problem with that."  At that point, the judge said that "based on [Taylor's] responses and what his anticipation of standby counsel would be," it was "clear" that Taylor was "not capable of representing himself."  As a result, the motion to proceed pro se was denied.

The judge did not engage in the full, searching colloquy described in Faretta, Crisafi, and Reddish to determine whether Taylor's waiver of counsel would be knowing and voluntary.  The court acted appropriately by cautioning Taylor about the sentence he faced at trial and asking whether he understood the charges.  But the judge's statement that Taylor needed to be "smarter than" his attorney was not the proper standard.  While he may have been correct that dispensing with counsel would not be the best choice for Taylor, it was erroneous to base his decision on that view, particularly where Taylor appeared otherwise "literate, competent, and understanding" and indicated his willingness to take responsibility for his decision.  Faretta, 422 U.S. at 835.

A-0073-15T1

"The right [of self-representation] is either respected or denied; its deprivation cannot be harmless." King, 210 N.J. at 22 (alteration in original) (quoting McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984)). As a result, although Taylor "may have been represented by a skilled attorney, the evidence against him may have been substantial, and the verdict may find strong support in the record; that matters not." Ibid.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION